Jeffrey L. KIMBROUGH, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 20A03–0901–CR–29.

Court of Appeals of Indiana.

Aug. 13, 2009.

Nancy A. McCaslin, McCaslin & McCaslin, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

Appellant-defendant Jeffrey L. Kimbrough appeals his conviction for Battery with a Deadly Weapon,[1] a class C felony, claiming that 1) the jury selection process was improper; 2) the trial court erred in admitting certain evidence at trial; 3) the jury was improperly instructed; 4) the State did not adequately rebut his claim of self-defense; 5) the restitution order was excessive; 6) he was improperly ordered to pay fines, court costs, and public defender fees because no indigency hearing was held; and 7) his trial counsel was ineffective.

Although we find no reversible error, we remand this cause with instructions that the trial court clarify its restitution order.

## FACTS

On December 28, 2006, James Peoples was working as a contractor for the Elkhart Housing Partnership at the Fleming Arms apartment complex. Part of the job involved the repair of kitchen cabinets in some of the units. Peoples's supervisor specifically instructed him not to replace the cabinets but to sand them down and put them back together.

Peoples hired Kimbrough, a childhood friend, to assist him with the project. After the men went to Menards and purchased some supplies, they went to Curtis Powell's apartment at Fleming Arms to begin work. At some point, Kimbrough and Peoples began to argue about how the kitchen cabinets should be fixed. When Peoples told Kimbrough that the cabinets were not going to be replaced, Kimbrough became "agitated" and "pi* *ed off." Tr. p. 559–60. Kimbrough then grabbed Peoples by the shirt collar, punched him in the face several times, and broke his glasses. As the argument escalated, Peoples picked up a hammer to defend himself. In response, Kimbrough grabbed a wooden table leg and hit Peoples in the head with it. After Peoples fell, Kimbrough stood over him, yelling "you mother-fu* * *ing ni* *er, I'll kill you." *Id.* at 573. Curtis entered the room, pushed Kimbrough away from Peoples, and called 911. Kimbrough then left the residence.

When the police and paramedics arrived, Peoples was bleeding profusely from his mouth and the side of his head. Peoples also had a bump on his head, and the officers noticed Peoples's torn shirt and

1. Ind.Code § 35–42–2–1(a)(3).

broken glasses. Peoples told the police officers that he and Kimbrough had gotten into an argument and that Kimbrough grabbed him and punched him in the face several times. Peoples also told the officers that after he picked up a hammer to defend himself, Kimbrough grabbed the table leg and hit him in the head with it several times.

Peoples's wife drove him to Elkhart General Hospital, where he received stitches and was given Vicodin for his pain. The pain in Peoples's head lasted for nearly one week and Peoples still has a "floater" in his eye and a scar on his face. *Id.* at 592–95.

Detective Scott Weaver of the Elkhart Police Department interviewed Kimbrough about the incident. Kimbrough told Detective Weaver that he and Peoples argued about the job at the apartment complex and started shoving each other. Kimbrough told Detective Weaver that he picked up a table leg and hit Peoples twice in the head with it after Peoples swung a hammer toward him.

On April 3, 2007, the State charged Kimbrough with committing battery with a deadly weapon, a class C felony. Prior to trial, Kimbrough filed a motion in limine to exclude the tape of the 911 telephone call on the grounds that it violated his right of confrontation. Kimbrough also claimed that this evidence was hearsay, unduly prejudicial, and cumulative.

Following a hearing, the trial court determined that the tape was not testimonial and did not violate Kimbrough's right to confront witnesses against him. The trial court also ruled that the tape was admissible under an exception to the hearsay rule and that it was not inflammatory or unduly prejudicial. Finally, the trial court reserved any ruling on the tape's cumulative nature until the other evidence was heard at trial.

During the jury selection process, the parties exhausted the entire juror panel the first day, but one of the seats remained unfilled. As a result, the trial court decided to summon prospective jurors who had failed to appear with the intention of filling the panel the following day. However, only three additional jurors appeared and all of them were struck from the panel.

Kimbrough desired to proceed with only thirteen jurors by moving one of the alternate jurors into the empty slot. However, the State objected because it had not used its peremptory challenges with regard to the jurors in the alternate slots in the same way it would have had those persons been in a "regular" juror seat. Tr. p. 420. Over Kimbrough's objection, the trial court decided to continue the trial for approximately one month until it could have additional jurors present to complete the selection process.

During the second round of juror selection that was conducted on September 23, 2008, the trial court granted the State's motion to excuse prospective juror Karner for cause after he informed the trial court that he would be distracted and unable to focus on the evidence because of job-related issues. The trial court determined that juror Karner "clearly and unequivocally" indicated that he was too distracted to pay attention to the proceedings. *Id.* at 235–36.

When Peoples was called to testify at trial, juror Josephine Donaldson immediately notified the bailiff that she was acquainted with Peoples. Donaldson informed the trial court that she had worked with Peoples "back in the late 1970s," and she had not seen Peoples "in at least fifteen years." *Id.* at 510–14. Donaldson also testified that she and Peoples never socialized together and nothing about their prior relationship would render it difficult

for her to be fair and impartial. Moreover, Donaldson stated that she would not give Peoples's testimony any more or less weight or credibility in light of her acquaintance with Peoples. The trial court rejected Kimbrough's request to dismiss Donaldson and the trial resumed.

Over Kimbrough's objection, Peoples was permitted to testify that Curtis, the tenant of the apartment, was in a position to observe the incident. Peoples testified that Curtis entered the room to see what was happening. Kimbrough also objected to the admission of the 911 tape on the sole ground that it was cumulative evidence. The trial court overruled the objection and the tape was admitted into evidence.

Kimbrough then objected to Elkhart Police Officer Stuart Herbert's testimony as to what Peoples told him when he and the paramedics arrived at the apartment. The trial court concluded that the State laid a proper foundation for admission of the statement and determined that Officer Herbert's testimony was admissible under the excited utterance exception to the hearsay rule.

Following the presentation of the evidence, the trial court read a final instruction to the jury, which defined serious bodily injury as "bodily injury that creates a substantial risk of death or that causes serious permanent disfigurement, unconsciousness, extreme pain, or permanent or protracted loss or impairment of the function of a bodily member or organ." Appellant's App. p. 38. Kimbrough did not object to this instruction.

Kimbrough was found guilty as charged, and on January 5, 2009, the trial court sentenced him to eight years of incarceration with one year suspended to probation. Kimbrough was also ordered to pay a $5,000 fine, which was suspended, and court costs, which did not have to be paid

until January 16, 2017. Kimbrough was also ordered to make restitution to Peoples in the amount of $1,084 and to reimburse the Elkhart Public Defender Supplemental Fund (Public Defender Fund) as conditions of probation in the amount of $500. Kimbrough now appeals.

## DISCUSSION AND DECISION

### I. Juror Selection

Kimbrough claims that his conviction must be reversed because the trial court erred in granting the State's motion to exclude juror Karner and in refusing to dismiss juror Donaldson. Kimbrough also contends that the trial court abused its discretion when it continued the trial for one month until a second alternate juror could be selected. As a result of these alleged errors, Kimbrough claims that he is entitled to a new trial because his due process rights were violated.

### A. Dismissal of Prospective Juror Karner

The decision to grant or deny a challenge for cause to a prospective juror is a matter within the trial court's discretion. *Fox v. State,* 717 N.E.2d 957, 961 (Ind.Ct.App.1999). We will reverse the trial court's decision only if it is illogical or arbitrary. *Id.* Moreover, we afford substantial deference to trial judges regarding this decision because they see jurors firsthand and are in a better position to assess a juror's ability to serve without bias and reach a decision based on the law. *Id.* at 961–62. Finally, we note that the purpose of voir dire is to determine whether the potential juror can render a fair and impartial verdict in accordance with the law and evidence. *Bradley v. State,* 649 N.E.2d 100, 106 (Ind.1995).

In this case, juror Karner informed the trial court that he could not focus on

the proceedings and the evidence because he would be distracted by the problems that his absence would cause at his place of employment. Tr. p. 212–13. Juror Karner also explained that his company was "behind in production" and he was responsible for training two new employees. *Id.* at 213–14.

In light of these circumstances, the trial court could have reasonably concluded that juror Karner would not be in a position to listen to the evidence, fairly participate in the deliberative process, and render a fair verdict based on that evidence. The trial court had the opportunity to observe and assess juror Karner's demeanor when he was making these claims, and we will not second-guess the trial court's decision to excuse juror Karner for cause. Therefore, Kimbrough's claim that the trial court abused its discretion in excusing juror Karner from serving on the jury fails.

*B. Refusal to Dismiss Juror Donaldson*

■ A defendant is entitled to a jury of people free from any bias against him. Implied bias may be attributed to a juror upon a finding of a certain relationship between the juror and a person connected to the case. *Alvies v. State,* 795 N.E.2d 493, 499 (Ind.Ct.App.2003). However, our Supreme Court has determined that a juror's casual working relationship with a witness does not render the juror biased even where that relationship exists at the time of the trial. *Creek v. State,* 523 N.E.2d 425, 427 (Ind.1988). Moreover, the timely disclosure of a juror's relationship with a witness or a party, coupled with an assertion that the juror will remain impartial, adequately protects a defendant's right to an impartial jury. *McCants v. State,* 686 N.E.2d 1281, 1285 (Ind.1997).

■ As discussed above, juror Donaldson followed the trial court's instructions and immediately notified the bailiff that she knew Peoples. Tr. p. 510–11. Juror Donaldson told the trial court that even though she and Peoples worked together more than thirty years ago, they never socialized together. *Id.* at 514–25. Although juror Donaldson testified that Peoples seemed to be a "good person," she acknowledged that nothing about her past relationship with Peoples would preclude her from being fair and impartial. *Id.* at 515, 518, 538–39.

In our view, the nature of the relationship between juror Donaldson and Peoples was not the type or degree that would render the juror's assurances to the trial court unbelievable. Therefore, we conclude that the trial court properly exercised its discretion in refusing to dismiss juror Donaldson.

*C. Continuance of Juror Selection*

■ Kimbrough also asserts that the trial court abused its discretion in continuing the trial proceedings for four weeks to obtain a second alternate juror. Kimbrough maintains that continuing the trial was "not a practical use of court time because the … case could have been heard and completed on one day if an alternate juror [had] been placed in the jury box." Appellant's Br. p. 31.

The record shows that the jury selection process used in this case was to fill all fourteen seats of the jury box at the same time and then call up new jurors to take the seats of any person who was excused. The individuals in seats thirteen and fourteen were to be the alternate jurors even though they could be selected before all the regular juror seats were filled.

As noted above, the entire panel was exhausted when the first day of jury selection concluded, but the parties had still not selected a full jury because seat eleven was not filled. Tr. p. 345–46, 349, 355–38. As a result, the trial court indicated that it was going to summon the prospective ju-

rors who had failed to appear that day and bring them in the following morning to continue the selection process. *Id.* at 355–58. Although Kimbrough initially indicated that he was willing to proceed with only thirteen jurors, he did not object to the trial court's procedure.

In accordance with the trial court's decision, only three individuals appeared the next day, and all were struck from the panel. *Id.* at 396–400. Although Kimbrough wanted to proceed with only thirteen jurors, the deputy prosecutor objected, noting that he had not used the peremptory challenges regarding the alternate jurors in the fashion that he did, had he known that those individuals would have been in a "regular" juror seat. Tr. p. 404–05. More specifically, the deputy prosecutor commented that

> [T]he two alternates that we sat, we said from the beginning were gonna be the alternates. I didn't use peremptories on 'em because ... I could have and I thought about doing that but I didn't because they were alternates.... I'm in a difficult position because I want to get this going as well, but my preference would not be to bring down one of the alternates. Because the deal was, they would—the two that were up there would be the alternates, I did my peremptories accordingly.

*Id.*

Thereafter, Kimbrough objected to any further continuance to permit additional jurors to be summoned. *Id.* at 408–10. The trial court did not believe that Kimbrough would be prejudiced by a continuance and continued the trial for one month to permit an additional panel of jurors to be summoned. *Id.* at 410–15.

We note that while it would have been within the trial court's discretion to fill the empty seat with one of the alternate jurors, we cannot say that the trial court abused its discretion in refusing to do so. Kimbrough directs us to no authority in support of his proposition, and we have found none. In fact, the trial court's decision to continue the trial until additional jurors could be summoned was fair to both parties, as there is no showing that the rules were changed regarding which jurors would be the alternate jurors.

Moreover, Kimbrough has not demonstrated how he might have been prejudiced by the continuance. As noted above, the trial court reset the trial only one month later. Kimbrough was not denied a speedy trial and he has not shown that any evidence was lost or destroyed, or that this short delay adversely affected any of the witnesses' memories. Indeed, Kimbrough only alleges a possibility that the existing members of the jury could have been influenced or adversely affected during that interval. And he points to nothing suggesting that any tainting of the juror members actually occurred. At all times during the jury selection process, the jurors were instructed not to discuss the case with anyone or to read any information about it. There is nothing to suggest that they did not follow that directive.

When considering these circumstances, it is apparent that the trial court was in the best position to know how much difficulty the continuance would create for its docket. If the trial court believed that any such problems were less significant than the need to have a full twelve-person jury with two alternate jurors, we decline to second-guess that determination. As a result, we conclude that the trial court did not abuse its discretion in continuing the trial for the purpose of juror selection.

## II. *Admission of Evidence*

Kimbrough next claims that his conviction must be reversed because the trial court erred in admitting certain evidence

at trial. Specifically, Kimbrough challenges the trial court's admission of: 1) a tape of the 911 telephone call; 2) Peoples's testimony regarding Curtis's response to the incident; 3) a police officer's testimony about the comments that Peoples made to him about the incident; and 4) Peoples's testimony regarding the period of time that he was in pain.

In resolving these issues, we initially observe that the trial court has broad discretion in ruling on the admission or exclusion of evidence. *Sallee v. State,* 785 N.E.2d 645, 650 (Ind.Ct.App.2003). A trial court's ruling on the admissibility of evidence will be disturbed on review only upon a showing of an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented. *Platt v. State,* 589 N.E.2d 222, 229 (Ind. 1992). Error may not be predicated upon a ruling that admits or excludes evidence unless a substantial right of the party is affected. Ind. Evidence Rule 103.

### A. 911 Call

■ Kimbrough maintains that the admission of the tape of the 911 call violated his right to confront witnesses against him as guaranteed by Article I, section 13 of the Indiana Constitution. The right to confront witnesses, as granted by the federal and state constitutions, includes the right of full, adequate, and effective cross-examination, which is fundamental and essential to a fair trial. *Andrews v. State,* 588 N.E.2d 1298, 1302 (Ind.Ct.App.1992). The face-to-face requirement of the Indiana Constitution is separate, and in addition to, the confrontation right afforded by the same provision and by the Sixth Amendment to the United States Constitution. *Hart v. State,* 578 N.E.2d 336, 337 (Ind.1991). The constitutional right of an accused to meet the witnesses face-to-face includes the right to cross-examine. *Brady v. State,* 575 N.E.2d 981, 988 (Ind.1991).

In this case, the record demonstrates that Kimbrough filed a motion in limine to exclude the admission of the 911 tape on confrontation, hearsay, prejudice, and cumulative grounds. Tr. p. 41–43, 46–47. More particularly, Kimbrough's counsel asserted that the admission of the 911 tape violated his right to confrontation because the individual who made the call could not be located, the call was testimonial, and the evidence was "used primarily to inflame the passions of the jury." Appellant's App. p. 146–52.

■ At trial, however, Kimbrough objected only on the ground that the tape was cumulative. Tr. p. 587. Inasmuch as this was the only claim that Kimbrough raised in the trial court challenging the admissibility of the 911 tape, he has waived the other arguments. *See Reid v. State,* 719 N.E.2d 451, 454 (Ind.Ct.App.1999) (observing that absent a contemporaneous objection at trial, a ruling on a motion in limine does not preserve an issue for appeal).

■ Waiver of this argument is further evidenced by Kimbrough's failure to present a cogent argument in support of his contentions. Although Kimbrough sets forth the various arguments that defense counsel and the prosecutor presented to the trial court during the hearing on the motion in limine, he has presented no argument as to why the admission of this evidence violated his right of confrontation. Indeed, the substance of his argument is that

> [T]he 911 tape was cumulative and its probative value was substantially outweighed by the danger of unfair prejudice.... Witnesses testified that call was made and paramedics and police

responded to the call. Admission as evidence was needless.

Appellant's Br. p. 38. For this additional reason, Kimbrough has waived his claim that admission of the 911 tape violated his right of confrontation.[2] Ind. Appellate Rule 46(A)(8).

Proceeding to Kimbrough's contention that the 911 tape should have been excluded because it was merely cumulative of other evidence that was admitted at trial establishing that the 911 call had been made. We note that no other witness testified as to the contents of the call and no one involved in the 911 call, including the dispatcher and Curtis, testified. Therefore, we cannot conclude that the 911 call was cumulative of other evidence. Moreover, Kimbrough has failed to demonstrate how the 911 call was inflammatory or unduly prejudicial in any way. As a result, Kimbrough's claim that the tape of the 911 call was erroneously admitted into evidence fails.

### B. Peoples's Testimony

██ Kimbrough also claims that the trial court should have excluded Peoples's testimony that Curtis entered the kitchen during the fight because he was "wondering what was going on." Tr. p. 565–66. Kimbrough maintains that this testimony should have been excluded because Peoples was merely "speculating" about why Curtis came into the room. Appellant's Br. p. 40.

The evidence established that Curtis was watching television in his apartment when Peoples and Kimbrough began to fight. Peoples was bleeding profusely and Kimbrough was threatening to kill him with a table leg. Tr. p. 573, 589–90, 614–15. In light of this evidence, it is hardly "speculative" that Curtis entered the kitchen to see what was occurring. Moreover, Peoples did not delve into any further detail about what Curtis might have thought about the incident, and Kimbrough has not established that the testimony unduly prejudiced him. As a result, we cannot say that the trial court abused its discretion in admitting this evidence.

### C. Officer's Testimony

██ Kimbrough next argues that the trial court erred in permitting Elkhart Police Officer Herbert to testify what Peoples told him at the scene. Kimbrough argues that the trial court erroneously determined that the statements qualified under the excited utterance exception to the hearsay rule.

██ For a statement to be admitted as an excited utterance, the following elements must be shown: 1) a startling event occurs; 2) a statement is made by a declarant while under the stress of excitement caused by the event; and 3) the statement relates to the event. *Gordon v. State*, 743 N.E.2d 376, 378 (Ind.Ct.App. 2001). The heart of the inquiry is whether the statement was "inherently reliable because the witness was under the stress of an event and unlikely to make deliberate falsifications." *Id.* The amount of time that has passed between the event and the statement is relevant but not dispositive. *Noojin v. State*, 730 N.E.2d 672, 676 (Ind.

---

2. As an aside, it is readily apparent that the purpose of the police dispatcher's questions was to ascertain and address an ongoing emergency—not to establish past events for use in a criminal investigation or prosecution. When Curtis called for help because Peoples was bleeding, the dispatcher asked questions to ascertain his name, his address, that some-one was fighting, and that an ambulance was needed. Ex. 6. Thus, the 911 tape was not testimonial. *See Collins v. State*, 873 N.E.2d 149, 153–55 (Ind.Ct.App.2007) (upholding the admission of a 911 call as nontestimonial because its purpose was to address an ongoing emergency), *trans. denied.*

2000). Moreover, the focus is on whether the declarant is still under the influence of the excitement engendered by the startling event. *Lieberenz v. State,* 717 N.E.2d 1242, 1246 (Ind.Ct.App.1999).

As discussed above, Peoples was attacked, punched in the face, and struck in the head with a wooden table leg. Peoples's statement to Officer Herbert indicated that Kimbrough grabbed him during an argument and punched him several times in the face. Peoples also told Officer Herbert that he picked up a hammer to defend himself, and Kimbrough struck him in the head with the table leg multiple times. Peoples then explained that Curtis pulled Kimbrough off of him and Kimbrough fled the scene. Peoples then told Curtis to call 911. Tr. p. 584–86.

██ Officer Herbert arrived at the apartment only three minutes after the 911 call was made. Officer Herbert testified that Peoples was upset, hurt, angry, and under the stress of the incident when he arrived. *Id.* at 617–18. Peoples was bleeding profusely and was attempting to stop the bleeding with a towel. Officer Herbert also noticed that Peoples's broken glasses were still on the floor. *Id.* at 614–15, 621–22. These circumstances do not suggest a calm, contemplative environment where Peoples had time for thoughtful reflection. As a result, the trial court correctly determined that Officer Herbert's testimony regarding the statements that Peoples made to him were admissible under the excited utterance exception to the hearsay rule.[3]

### D. *Peoples's Testimony Regarding Pain*

██ Kimbrough claims that the trial court erred in allowing Peoples to testify at trial about the length of time during which he was in pain after the incident. Specifically, Kimbrough argues that this testimony was not relevant because the State charged him with battery while armed with a deadly weapon, and this charge did not involve the infliction of a serious bodily injury.

We note that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. The standard of admissibility under this rule is a liberal one. *Jackson v. State,* 712 N.E.2d 986, 988 (Ind.1999).

As set forth in Indiana Code section 35–42–2–1(a)(3):

> A person who knowingly or intentionally touches another person in a rude, insolent, or angry manner commits battery, a class B misdemeanor. However, the offense is: ... (3) a Class C felony if it results in serious bodily injury to any other person or if it is committed by means of a deadly weapon....

In accordance with the charging information, the State was required to prove that the wooden table leg constituted a deadly weapon. In accordance with Indiana Code section 35–41–1–8(a)(2), a deadly weapon is an object that, in the way it is used, is readily capable of causing serious bodily injury. And serious bodily injury includes "extreme pain." I.C. § 35–41–1–25.

When examining these statutes along with the charging information, the amount of time that Peoples was in pain from the

---

**3.** As an aside, we note that Kimbrough also challenges the admission of this evidence on the grounds that his right to confrontation was violated. Appellant's Br. p. 45–46. However, because Kimbrough failed to object at trial on this basis, the claim is waived. *See Malone v. State,* 700 N.E.2d 780, 784 (Ind. 1988) (holding that a defendant may not object on one ground at trial and then raise a different ground on appeal).

injury that Kimbrough inflicted with the table leg was relevant as to whether that object constituted a deadly weapon. Put another way, if it was established that Peoples sustained pain for a long period of time after being hit with the table leg, it was more probable that the table leg inflicted—or was readily capable of inflicting—serious bodily injury. Therefore, evidence regarding the duration of Peoples's pain was highly probative as to whether Kimbrough used the table leg as a deadly weapon when committing the battery. As a result, the evidence satisfied the liberal standard governing the determination of relevance, and we conclude that the trial court properly admitted Peoples's testimony at trial.

### III. Jury Instruction

■ Kimbrough maintains that his conviction must be reversed because the trial court should not have instructed the jury on the definition of "serious bodily injury." Appellant's Br. p. 49–50. Specifically, Kimbrough argues that the instruction was erroneous because he was charged only with committing battery by means of a deadly weapon.

■ We initially observe that Kimbrough's counsel did not object to this instruction. Hence, the issue is waived. *See Clay v. State,* 766 N.E.2d 33, 36 (Ind. Ct.App.2002) (holding that the failure to object to an instruction at trial results in waiver of the issue on appeal). However, in an effort to avoid waiver, Kimbrough contends that the instruction constituted fundamental error. We note that the fundamental error rule is extremely narrow. *Boesch v. State,* 778 N.E.2d 1276, 1279 (Ind.2002). Fundamental error occurs only when the error "constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Id.*

As discussed above, the State was required to prove that Kimbrough used a deadly weapon to commit the battery. A deadly weapon is a weapon, device, or other material "that in the manner it is used, or could ordinarily be used, or is intended to be used, is readily capable of causing serious bodily injury." I.C. § 35–41–1–8(a)(2). Thus, to decide whether a wooden leg constitutes a deadly weapon, the jury had to determine whether that object was readily capable of causing serious bodily injury. *See Whitfield v. State,* 699 N.E.2d 666, 670 (Ind.Ct.App.1998) (stating that whether sufficient evidence exists to establish that an object constitutes a deadly weapon "is determined by looking to whether the weapon had the actual ability to inflict serious injury").

In this case, the jury could not make such a determination without knowing the definition of serious bodily injury. As a result, the trial court tracked the language set forth in Indiana Code section 35–41–1–25 and instructed the jury that

> Serious Bodily Injury is defined [by] law as meaning bodily injury that creates a substantial risk of death or that causes serious permanent disfigurement, unconsciousness, extreme pain or permanent or protracted loss or impairment of the function of a bodily member or organ.

Appellant's App. p. 50.

In light of the above, it is apparent that the trial court instructed the jury on a critical term that was central to that charge that had been lodged against Kimbrough. And, contrary to Kimbrough's claim that the trial court erroneously instructed the jury that Kimbrough could be convicted of battery as a class C felony if the State proved that the battery caused Peoples to sustain a serious bodily injury, one of the final instructions recited the language set forth in the State's charging

information. Specifically, this instruction provided that

> Kimbrough ... did ... knowingly touch another person, to-wit: James Peoples, in a rude, insolent or angry manner *which said act was committed by means of a deadly weapon, to-wit: a wooden table leg;* all of which is contrary to the form of I.C. § 35–42–2–1.

Appellant's App. p. 48 (emphasis added). Another instruction that was given stated that "A person who knowingly touches another person in a rude insolent or angry manner *by means of a deadly weapon, commits battery, a class 'C' felony.*" *Id.* at 49 (emphasis added).

When considering the above final instructions, Kimbrough's claim that the trial court erroneously instructed the jury on an offense that was not charged, fails. As a result, we conclude that the trial court properly instructed the jury on the definition of serious bodily injury.

### IV. Self–Defense

Kimbrough next contends that his conviction must be reversed because the State did not adequately rebut his claim of self-defense. Specifically, Kimbrough maintains that Detective Weaver's testimony, which recounted Kimbrough's version of the events and was not contradicted by any witness other than Peoples, established that Kimbrough acted in self-defense.

The standard of review for a challenge to the sufficiency of evidence to rebut a claim of self-defense is the same as the standard for any sufficiency of the evidence claim. *Wilson v. State,* 770 N.E.2d 799, 801 (Ind.2002). If a defendant is convicted despite his claim of self-defense, this Court will reverse only if no reasonable person could say that self-defense was negated by the State beyond a reasonable doubt. *Id.* at 800–01.

A valid claim of self-defense is a legal justification for an otherwise criminal act. *Henson v. State,* 786 N.E.2d 274, 277 (Ind.2003). A person is justified in using reasonable force against another person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force. Ind.Code § 35–41–3–2. In order to prevail on such a claim, the defendant must show that he: (1) was in a place where he had a right to be; (2) did not provoke, instigate, or participate willingly in the violence; and (3) had a reasonable fear of death or great bodily harm. *Wilson,* 770 N.E.2d at 800. An initial aggressor or a mutual combatant, whether or not the initial aggressor, must withdraw from the encounter and communicate the intent to do so to the other person, before he may claim self-defense. When a claim of self-defense is raised and finds support in the evidence, the State has the burden of negating at least one of the necessary elements. *Id.* The State can rebut the defendant's claim of self-defense by relying on the evidence of its case-in-chief. *Carroll v. State,* 744 N.E.2d 432, 433 (Ind.2001).

In this case, Kimbrough did not testify on his own behalf. In essence, the only evidence that was offered in support of Kimbrough's self-defense claim was Detective Weaver's testimony. More specifically, Kimbrough related to Detective Weaver that he and Peoples were arguing and shoving each other, that Peoples swung a hammer at him, and that he subsequently struck Peoples twice in the head with the table leg. Tr. p. 662–63.

Notwithstanding Kimbrough's contention, this evidence did not establish a valid claim of self-defense. Rather, this evidence showed that Kimbrough instigated the violence and was a mutual combatant in the incident. Therefore, even by Kimbrough's own account, it was established

that he and Peoples were engaged in a mutual shoving match that escalated without any attempt by Kimbrough to withdraw from the encounter.

Even more compelling, the jury was not required to credit Kimbrough's self-serving version of events. As noted above, the State's evidence established that Peoples grabbed the hammer and used it to push Kimbrough off of him. Tr. p. 567–68. Kimbrough responded by hitting Peoples in the temple with the table leg and threatening to kill him. *Id.* at 571–73. This evidence, even if credited, more than sufficiently rebuts Kimbrough's claim of self-defense. Indeed, the evidence shows that Kimbrough was the initial aggressor who instigated and provoked the violence. And it was Peoples—not Kimbrough—who was acting in self-defense.

In essence, Kimbrough's argument is merely a request that we reweigh the evidence, which we will not do. Therefore, Kimbrough's claim that the State did not adequately rebut his claim of self-defense fails.

### V. Sentencing

Kimbrough next argues that the trial court erred in sentencing him. Specifically, Kimbrough argues that the trial court erred in imposing fines and court costs and in ordering him to reimburse the Public Defender Fund in the amount of $500 because no indigency hearing was held regarding his ability to pay those amounts. Kimbrough also challenges the amount of restitution that he was ordered to pay on the grounds of fundamental error.

 We initially observe that sentencing decisions, including decisions to impose restitution, fines, costs, or fees, are generally left to the trial court's discretion. *Long v. State,* 867 N.E.2d 606, 618 (Ind.Ct. App.2007) (restitution); *Banks v. State,* 847 N.E.2d 1050, 1051 (Ind.Ct.App.2006)

(fees). If the trial court imposes fees within the statutory limits, there is no abuse of discretion. *Mathis v. State,* 776 N.E.2d 1283, 1289 (Ind.Ct.App.2002).

In this case, the record shows that Kimbrough posted a surety bond in the amount of $10,000 through the Lexington National Insurance Corporation (Lexington National) and remained free on that bond throughout the pendency of this case. His bond was not revoked until the jury returned a guilty verdict. Appellant's App. p. 8. When the trial court appointed a public defender for Kimbrough at the initial hearing, it explicitly "reserved the right to order defendant to reimburse Elkhart County for services of Public Defender." *Id.* at 3.

Notwithstanding these circumstances, Kimbrough maintains that the reimbursement amount ordered by the trial court should not have exceeded $100 in light of our decision in *Turner v. State,* 755 N.E.2d 194, 200 (Ind.Ct.App.2001). In *Turner,* the trial court ordered the defendant to pay a $1,000 public defender reimbursement fee. On appeal, Turner argued that such a reimbursement fee "exceeded statutory limits." *Id.* at 199.

In concluding that the trial court abused its discretion in ordering Turner to reimburse the public defender in the amount of $1000, we considered the provisions of Indiana Code § 35–33–7–6(c):

> If the court finds that the person is able to pay part of the cost of representation by the assigned counsel, the court shall order the person to pay the following:
>
> (1) For a felony action, a fee of one hundred dollars ($100).

In accordance with this statute, and in rejecting the applicability of Indiana Code § 35–33–8–3.2, which authorizes a trial court to deduct additional money to cover the cost of a public defender from a bond

that is posted, we specifically observed that "Turner posted no bond and was incarcerated following his arrest through the conclusion of his trial." 755 N.E.2d at 200. Moreover, we noted that

> [W]hile Indiana Code Sections 33–9–11.5–6[4] and 33–19–2–3[5] grant trial courts the discretion to impose representations costs against a defendant in excess of one $100, those statutes do not apply in this instance. Indiana Code Section 33–9–11.5–6 applies only in those situations where "the court makes a finding of ability to pay the costs of representation," while Indiana Code Section 33–19–2–3 applies only to those defendants that the court deems "not indigent." Here, the trial court found defendant indigent for the purposes of appointing a public defender and then renewed its indigency finding when it appointed pauper appellate counsel. *The trial court never declared Turner "not indigent" or otherwise determined that he had the ability to pay the cost of representation.* The only statutory means at the trial court's disposal for imposing costs on Turner was therefore Indiana Code Section 35–33–7–6(c), which caps such costs for a felony at $100. Thus, the trial court exceeded its statutory authority when it assessed Turner a reimbursement fee of more than $100.

*Id.* (emphasis added).

Thereafter, we had the occasion to examine the provisions of Indiana Code section 33–37–2–3 in *Rich v. State,* 890 N.E.2d 44, 47 (Ind.Ct.App.2008), *trans. denied,* where the defendant argued that it was an abuse of discretion for the trial court to order him to reimburse the public defend-

er in the amount of $200 as a condition of probation.

Indiana Code section 33–37–2–3 states that

> (a) Except as provided in subsection (b), when the court imposes costs, it shall conduct a hearing to determine whether the convicted person is indigent....
>
> (b) A court may impose costs and suspend payment of all or part of the costs until the convicted person has completed all or part of the sentence. If the court suspends payment of the costs, the court shall conduct a hearing at the time the costs are due to determine whether the convicted person is indigent....
>
> ...
>
> (e) If, after a hearing under subsection (a) or (b), the court determines that a convicted person is able to pay part of the costs of representation, the court shall order the person to pay an amount of not more than the cost of the defense services rendered on behalf of the person....

In concluding that the trial court did not err in imposing the $200 reimbursement fee, we observed that

> [T]he trial court's order requires that Rich reimburse the Public Defender as a condition of probation, which will not begin until after he has completed the executed portion of his sentence. *Therefore, under section 33–37–2–3(b), the trial court was not required to hold a hearing until Rich has completed the executed portion of his sentence. As Rich is not required to pay the public defender's fee at this time, holding a hearing to determine his current ability to pay was not required. Cf. Whedon v.*

---

4. This statute has been repealed and is now codified at Indiana Code section 33–40–3–6.

5. This statute has been repealed and is now codified at Indiana Code section 33–37–2–3.

*State*, 765 N.E.2d 1276, 1279 (Ind.2002) (recognizing that "a defendant's financial resources are more appropriately determined not at the time of initial sentencing but at the conclusion of incarceration, thus allowing consideration of whether the defendant may have accumulated assets through inheritance or otherwise"). We conclude the trial court did not abuse its discretion in ordering Rich to reimburse the Public Defender. *Rich*, 890 N.E.2d at 48 (emphasis added).

 Like the circumstances in *Rich*, Kimbrough was not required to reimburse the Public Defender Fund until he has completed the executed portion of his sentence. Appellant's App. p. 107–08. Hence, because the trial court did not order Kimbrough to pay that fee immediately, it was not necessary for the trial court to hold a hearing to determine his current ability to pay.[6] *Rich*, 890 N.E.2d at 48; *Whedon*, 765 N.E.2d at 1279. As a result, the trial court did not abuse its discretion in ordering Kimbrough to reimburse the Public Defender Fund.[7]

In addition to the trial court's order regarding the payment of public defender fees, Kimbrough maintains that the sentencing order must be set aside because the trial court did not conduct an indigency hearing with regard to the payment of court costs and the $5000 fine that the trial court suspended.

 Pursuant to our Supreme Court's opinion in *Whedon*, we note that although a trial court may impose a fine or court costs on an indigent defendant, an indigent person cannot be imprisoned for failing to pay that fine or costs. 765 N.E.2d at 1279. Again, as were the circumstances in *Rich*, Kimbrough was not required to pay the fines and court costs immediately upon conviction. Moreover, even though the trial court ordered Kimbrough to pay a $5000 fine, it suspended it. Hence, only if the trial court rescinds the suspension at a later date and Kimbrough is imprisoned for failing to pay the fine, will this claim become ripe for adjudication. *Cf. Gustman v. State*, 660 N.E.2d 353, 356 (Ind.Ct. App.1996) (holding that an indigent defendant's challenge to a probation condition that he pay child support was not ripe because the defendant was not yet being imprisoned for violating that condition).

 The trial court also gave Kimbrough until January 16, 2017, to pay the court costs. In light of that determination, the trial court afforded Kimbrough nearly eight years in which to pay those costs, and he will be incarcerated for no more than seven years.[8] As a result, we cannot

---

6. As an aside, we agree with the conclusion reached in *Turner* and *May v. State*, 810 N.E.2d 741 (Ind.Ct.App.2004), regarding the trial court's obligation to determine whether a defendant must pay representation costs in excess of $100 pursuant to Indiana Code section 35–33–7–6(c). More particularly, when those fees become due, the trial court must conduct a hearing and make a finding pursuant to Indiana Code section 33–40–3–6 and/or Indiana Code section 33–19–2–3 as to whether Kimbrough has the ability and financial resources to pay the amount ordered pursuant to Indiana Code section 33–40–3–6 and/or Indiana Code section 33–19–2–3.

7. The State correctly points out that Indiana Code section 35–33–8–3.2(a)(2) authorizes the trial court to retain all or a part of the cash or securities of the defendant's bond toward the payment of fines, costs, and fees. However, as noted above, it is apparent that Kimbrough posted a surety bond through Lexington National. As a result, it is not likely that any amount of the posted bond remains for the trial court to retain and apply toward the payment of Kimbrough's fees and costs.

8. Assuming that Kimbrough earns credit time while incarcerated, he may be eligible for release in three and one-half years. *See* Ind. Code § 35–50–6–3(a) (recognizing that a per-

say that the trial court erred when it did not hold a hearing to determine Kimbrough's ability to pay those court costs. *See Whedon,* 765 N.E.2d at 1279 (recognizing that a defendant's financial resources are more appropriately determined not at the time of initial sentencing but at the conclusion of incarceration, thus allowing consideration of whether the defendant may have accumulated assets through inheritance or otherwise).

With regard to Kimbrough's challenge to the amount of restitution that was ordered, we will not reverse a restitution order unless the trial court abuses its discretion. *Myers,* 848 N.E.2d at 1109. An abuse of discretion occurs when the trial court misinterprets or misapplies the law. *Id.* The amount of restitution that is ordered must reflect the actual loss incurred by the victim. *Id.* Additionally, while a civil judgment does not bar the entry of a restitution order, a victim is entitled to only one recovery. Ind.Code § 35-50-5-3; *Haltom v. State,* 832 N.E.2d 969, 971–72 (Ind.2005). Thus, if a defendant has already paid all or part of a civil judgment, the amount of restitution must be offset by the amount already recovered. *Myers,* 848 N.E.2d at 1110–11.

In this case, the trial court informed Kimbrough that there was an active body attachment for him in Elkhart Superior Court. Moreover, the court clerk indicated that there was a $350 civil judgment against Kimbrough and that Peoples was the holder of that judgment. The trial court also informed Kimbrough that the trial judge in the civil matter would not withdraw the body attachment without Peoples's consent.

Although Kimbrough did not object to the restitution order when he was sentenced, he points out on appeal that if the judgment in the civil case was for Peoples's hospital bills, "he would be recovering twice for the same loss if the defendant were to pay restitution." Appellant's Br. p. 60. Indeed, we have addressed restitution issues despite the lack of any objection on the grounds of fundamental error. *Lohmiller v. State,* 884 N.E.2d 903, 915–16 (Ind.Ct.App.2008). As a result, we will address Kimbrough's claim that the trial court may have duplicated a portion of the restitution amount that was ordered in the civil matter.[9]

As discussed above, Kimbrough was ordered to pay a total of $1,084 in restitution to Peoples. More specifically, the trial court ordered Kimbrough to pay $590 in emergency room bills, $75 in physician fees, and $419 for his broken glasses. App. p. 91, 93–95. And, as noted above, Peoples held a judgment against Kimbrough in the amount of $350 in a civil case.

In light of these circumstances, we choose to remand this matter with instructions that the trial court clarify its restitution order. If it is determined that the amount of restitution that the trial court ordered Kimbrough to pay is duplicative of that contained in the civil judgment, the restitution order should be adjusted accordingly.

---

son assigned to Class I earns one day of credit time for each day the person is imprisoned for a crime or confined awaiting trial or sentencing).

9. Also, as we observed in *Rich,* "the vast weight of the recent caselaw in this state indicates that appellate courts will review a trial court's restitution order even where the defendant did not object based on the rationale that 'a restitution order is part of the sentence and it is the duty of the appellate courts to bring illegal sentences into compliance.'" 890 N.E.2d at 48 (quoting *Golden v. State,* 553 N.E.2d 1219, 1223–24 (Ind.Ct.App. 1990)).

In conclusion, with the exception of our determination that the restitution order must be considered on remand, Kimbrough's challenges to the trial court's sentencing order fails.

### VI. *Ineffective Assistance of Trial Counsel*

Kimbrough next claims that we must reverse his conviction because he received the ineffective assistance of trial counsel. Specifically, Kimbrough argues that his trial counsel was ineffective for "failing to have defendant take the stand" and for not objecting to the final instruction that defined the term "serious bodily injury." Appellant's Br. p. 62–64.

Claims of ineffective assistance of counsel are analyzed under the two-part test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail, the appellant must show that defense counsel's representation fell below an objective standard of reasonableness and that the deficiencies in counsel's performance prejudiced the defense. *Coleman v. State,* 694 N.E.2d 269, 272 (Ind.1998). The defendant carries a heavy burden in satisfying this claim because we strongly presume that counsel rendered adequate assistance. *Id.* On appeal, the presumption of counsel's competency must be rebutted by strong and convincing evidence. *Id.*

To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Polk v. State,* 822 N.E.2d 239, 244 (Ind.Ct.App.2005). A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Additionally, when the defendant bases an ineffective assistance of counsel claim on counsel's failure to object at trial, the defendant must show that a proper objection,

if made, would have been sustained. *Jackson v. State,* 683 N.E.2d 560, 563 (Ind. 1997). The failure to satisfy either prong will cause the ineffectiveness claim to fail, and most ineffectiveness claims can be resolved by a prejudice inquiry alone. *Polk,* 822 N.E.2d at 245.

With regard to Kimbrough's claim that his trial counsel was ineffective for failing to direct him to testify on his own behalf, we note that the decision whether to testify is personal to the defendant. The decision is one that the defendant—and not counsel—controls. *Daniels v. State,* 741 N.E.2d 1177, 1187 (Ind.2001).

In this case, there is no evidence in the record suggesting that Kimbrough had any desire to testify or that his trial counsel prevented him from doing so. In the absence of any evidence to that effect, we will not presume that Kimbrough's counsel impeded his right to decide whether or not to testify. Moreover, Kimbrough has presented no evidence indicating what advice counsel may have offered regarding the decision not to testify, and Kimbrough has not shown what the substance of his testimony would have been had he testified. As a result, Kimbrough has failed to show that his trial counsel was ineffective on this basis.

With regard to Kimbrough's claim that his trial counsel was ineffective for failing to object to the jury instruction that defined serious bodily injury, we have concluded that the jury was required to decide whether the table leg constituted a deadly weapon. Because a deadly weapon is an object that is readily capable of causing serious bodily injury, the jury needed to know what would constitute serious bodily injury.

We have also determined that the instruction did not convey to the jury that it had the option of convicting Kimbrough of

an offense that was not charged. Thus, because the instruction was entirely proper, no objection to it would have been sustained. As a result, Kimbrough's claim of ineffective assistance of trial counsel also fails on this basis.

## CONCLUSION

In light of our discussion above, we conclude that there was no error in the juror selection process and that the 911 tape was properly admitted into evidence. We further find that the trial court did not err in admitting a police officer's testimony regarding the comments that Peoples made to him about the incident, or in permitting Peoples to testify about the amount of time that he was in pain. The trial court also properly permitted Peoples to testify as to why Curtis entered the room during the fight, and the trial court did not err in instructing the jury as to the definition of "serious bodily injury." Finally, we conclude that the evidence was sufficient to rebut Kimbrough's self-defense claim and, but for the necessary clarification of the restitution order, we find that Kimbrough was properly sentenced and his trial counsel was not ineffective.[10]

The judgment of the trial court is affirmed and remanded for clarification of the restitution order.

FRIEDLANDER, J., and RILEY, J., concur.

---

10. Although Kimbrough's final claim is that the "cumulative effect" of the errors that were committed at trial warrants reversal, we have found no errors. Thus, Kimbrough's contention fails. *See Forgey v. State*, 886 N.E.2d 16, 22 (Ind.Ct.App.2008) (rejecting the defendant's cumulative error claim because the trial court had not committed any errors).