**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MATTHEW D. ANGLEMEYER**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**IAN MCLEAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| SEAN COLE, )<br>)<br>    Appellant-Defendant, )<br>)<br>         vs. )<br>)<br>STATE OF INDIANA, )<br>)<br>    Appellee-Plaintiff. ) | No.  49A02-1202-CR-66 |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Steven R. Eichholtz, Judge
Cause No. 49G20-1106-FA-041507

**September 24, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

Sean Cole was arrested by members of a local task force assembled to combat drug sales. At trial, law enforcement officers testified about how drug dealers typically behave and how drug sales are conducted. This testimony included references to Cole as a dealer. Cole now appeals his conviction for Class B felony dealing in cocaine, arguing that the trial court erred in permitting this testimony. He also contends that the trial court erred in refusing his jury instruction on the definition of contamination. We conclude that one police detective offered improper opinion testimony when he specifically referred to Cole as a dealer. However, this error was harmless in light of the other evidence of Cole's guilt. We also conclude that the trial court did not err in refusing Cole's tendered instruction. We affirm.

**Facts and Procedural History**

In late 2010, a number of police officers with the Indianapolis Metropolitan Police Department were investigating street-level drug dealing as part of the Drug Market Intervention Project ("the DMI project"). In December, detectives received a phone call related to the DMI project. The caller informed police that a man known as Little Shine was selling drugs. The caller also provided a phone number for Little Shine.

IMPD Detective Joshua Harpe called the phone number. When a man answered, Detective Harpe asked if the man was "good," which was known to mean whether the man had any drugs to sell. Tr. p. 25. The man said yes and asked what Detective Harpe was looking for. *Id.* at 25-26. Detective Harpe responded that he was looking for "a

twenty," or approximately .2 grams of crack cocaine. *Id*. at 26. The man told Detective Harpe to meet him in a nearby Taco Bell parking lot.

Detective Harpe and his partner drove to the location in an unmarked police car with hidden surveillance equipment. When they arrived, Detective Harpe received a phone call from Cole.[1] Detective Harpe also saw Cole sitting in a parked car nearby. Cole got out of the car and walked to Detective Harpe's car. After a brief conversation, both men got out of Detective Harpe's car and went to Cole's car. Detective Harpe sat in the passenger seat and watched as Cole measured crack cocaine on a scale. Detective Harpe paid Cole, and Cole handed him the cocaine. Detective Harpe took the cocaine back to his car, and Cole left the parking lot. The entire transaction was recorded on video. Cole was arrested several days later and charged with Class B felony dealing in cocaine and Class D felony possession of cocaine.[2]

At trial, three of the State's witnesses—Detective Harpe, Detective Craig McElfresh, and Officer Joseph Kraeszig—provided background information regarding the DMI project. This background information included testimony from Detective Harpe about why they began investigating Cole. Detective Harpe testified that "we received information from another police officer outside of our unit that a [] black male named Little Shine was possibly selling drugs, and we were provided a phone number for him."

---

[1] Cole does not dispute that he was the one who made this phone call or that he uses the nickname "Little Shine." He does not concede, however, that he was the individual with whom Harpe originally spoke. *See* Appellant's Br. p. 2-3.

[2] Detective Harpe testified at trial that Cole was not arrested immediately after his interaction with Detective Harpe because "[I]f we were to go in and make an undercover buy and arrest a dealer . . . it wouldn't take the other dealers in the neighborhood long to figure out who the undercover officers were, and . . . we wouldn't have the opportunity to make any more buys." Tr. p. 24.

3

*Id.* at 23.  Detective Harpe explained that this information "fit into a project that we were working on at the time[,] which was called [the DMI project]." *Id.*

The State asked Detective Harpe to explain the DMI project.  Harpe testified that the project is

> An ongoing project[,] usually a span of months[,] to target street[-]level narcotics dealing to improve the quality of life within a given neighborhood.  The short of it is basically an undercover narcotics officer, two or three go in and start targeting street[-]level narcotics dealers that are out on the street actually selling wherever the quality of life issue, maybe children walking by or something like that.  Those subjects are then identified, and after a period of time[,] once the – we feel like we have exhausted all of those dealers, we have all the information we need, we kind of go in and one big roundup and arrest as many of them as we possibly can[,] all at one time to try to create a void in the market, and try to completely wipe out a drug market all at once.

*Id.* at 24.  Detective Harpe provided additional background information regarding how drug dealers typically act when selling drugs, including the terminology used between users and dealers, such as:  "'Are you good' is [] street terminology to a dealer from a user.  [It means] do you have product for me to buy?" *Id.* at 26.

Later, when testifying about the undercover operation, Detective Harpe twice referred to Cole as a dealer.  After the video recording of the transaction with Cole was admitted into evidence, Detective Harpe described his partner, who had recorded the event, as "trying to be as discr[eet] as he can knowing that *the dealer* and I are in the car right next to him."  *Id.* at 44 (emphasis added).  Later, in response to a juror question, Detective Harpe gave the following testimony:

> Mr. Cole wasn't arrested on the scene that day; he was part of that DMI project we had talked about briefly at the beginning of the interview.  *He was arrested sometime later in a big roundup of a bunch of different dealers.*  So when our identification officers stopped him, they – they didn't

4

discover that cocaine is my guess, and it's just one of these things where when these dealers are stopped, our identification people try to make it clear when – when they stop them, we try to look routine because we don't want them wise to the fact that this stop has something to do with the cocaine that was sold to the integrity of the investigation is intact, and we can continue to make more buys to different people in the neighborhood and try to get all the street level dealers out of there at once.

*Id.* at 61-62 (emphases added).

Detective McElfresh and Officer Kraeszig also testified about the DMI project and the behavior of drug dealers. *See id.* at 83-84 ("[T]hey keep us apprised of what is going on over the radio while an undercover officer is meeting with the drug dealer."), 127 ("[The purpose of the investigation] is to improve the quality of life for people in the neighborhood who have street[-]level narcotics dealers that are out on the street blatantly selling narcotics . . . [T]hey all have nicknames that they use. In this particular incident it was Little Shine.").

There was also testimony about Detective Harpe's treatment of the cocaine he purchased from Cole. Detective Harpe carried the cocaine from Cole's car to the undercover vehicle in his hand, rather than any sort of plastic bag. He testified that he might have put the cocaine in his jacket pocket, but could not remember. *Id.* at 52. Detective Harpe also said that if he had put the cocaine in his jacket pocket, it was possible that he might have worn that jacket in former undercover drug buys, making it further possible the jacket pocket might have held drugs at some point. *Id.* Nonetheless, Detective Harpe testified that it was "highly unlikely" that the cocaine he purchased from Cole had been exposed to any other substance. *Id.*

5

Dustin Crawford, a forensic drug chemist, testified that he had performed two tests—a gas chromatography test and a second chemical test—on the substance, and the tests confirmed that it was cocaine. *Id.* at 104. Crawford said that the gas chromatography test would have indicated any contaminants, which it did not do. *Id.* at 108. He also testified that the chemical test would have provided atypical results if the substance was contaminated, which it also did not do. *Id.* at 113-14.

At the close of evidence, Cole tendered a jury instruction on contamination: "Contamination occurs when an unknown sample is mixed with or comes into contact with another, and that action causes an erroneous test." *Id.* at 163. The State objected to the instruction, arguing that there was no case law or citation accompanying it and that it suggested a "presumption that [contamination] causes an erroneous test . . . ." *Id.* The trial court declined to give the instruction because "I don't know where it comes from, and it does tend to lead the jury in a direction . . . ." *Id.*

The jury found Cole guilty on both counts, but the trial court entered judgment of conviction on Class B felony dealing in cocaine only. The court sentenced Cole to thirteen years in the Department of Correction with eight years executed and five years suspended, followed by a two-year probationary period.

Cole now appeals.

**Discussion and Decision**

Cole raises two issues on appeal: (1) whether the trial court erred when it permitted law enforcement officers to refer to Cole as a dealer during his trial and (2)

6

whether the trial court erred in refusing Cole's instruction on the definition of contamination.

## I. Opinion Evidence

Cole argues that in repeatedly referring to him as a dealer, the State's witnesses offered improper opinion evidence under Indiana Evidence Rule 704(b). Cole argues that these repeated references prevented the jurors from forming their own conclusions regarding his guilt or innocence, and thus he was denied a fair trial.

At trial, Cole did not object to the law enforcement officers' use of the word dealer. His claims are therefore waived unless he can show that fundamental error occurred. *Kimbrough v. State*, 911 N.E.2d 621, 634 (Ind. Ct. App. 2009). The fundamental-error rule is extremely narrow. *Id.* Fundamental error occurs only when the error "constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Id.*

"Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." Ind. Evidence Rule 704(b). Here, the trial court permitted Detectives Harpe, McElfresh, and Officer Kraeszig to testify without objection about how drug dealers behave and how drug deals are conducted. Detective Harpe, in particular, twice referred to Cole as a dealer. *See* Tr. p. 44, 61-62. Cole concedes that the law enforcement officers were expert witnesses and therefore properly permitted to testify as to what typically occurs in drug sales. Appellant's Br. p. 11. He argues,

7

however, that they exceeded the scope of proper expert testimony and offered an opinion that he was guilty. We addressed this issue in *Scisney v. State* and held that

> a police officer or law enforcement official who is offered and qualified as an expert in the area of drugs, drug trade, drug trafficking, etc., may offer testimony as to whether particular facts tend to be more or less consistent with dealing in drugs. *However, the expert may not make conclusion as to whether the defendant is a dealer* or whether the defendant had the intent to deal or deliver . . . . In essence, the expert may comment on the facts of the case, but must refrain from making any conclusions as to the defendant's intent, guilt, or innocence.

690 N.E.2d 342, 346 (Ind. Ct. App. 1997), *aff'd in relevant part*, 701 N.E.2d 847 (Ind. 1998) (emphasis added). The State attempts to distinguish *Scisney* by arguing that the majority of the testimony in this case, particularly Detective McElfresh and Officer Kraeszig's testimony, amounted to general references to what dealers do or how they act, which is permissible. Even if we ignore that general testimony, we are left with Detective Harpe's specific references to Cole as a dealer. *See* Tr. p. 44, ("[My partner is] trying to be as discr[eet] as he can knowing that the dealer and I are in the car right next to him."), 61-62 ("[Cole] was arrested sometime later in a big roundup of a bunch of different dealers."). As to those statements, we agree with Cole that this testimony amounted to a conclusion as to Cole's guilt, and thus violated Rule 704(b).

We conclude, however, that this error was harmless. The improper admission of evidence is harmless error when the conviction is supported by substantial independent evidence of guilt such that there is no substantial likelihood that the questioned evidence contributed to the conviction. *Hape v. State*, 903 N.E.2d 977, 991 (Ind. Ct. App. 2009), *trans. denied*. Such is the case here. The jury heard eyewitness testimony that Cole sold cocaine to Detective Harpe. The State also admitted into evidence a video recording of

8

Detective Harpe's transaction with Cole, and a forensic chemist testified that the substance sold by Cole was cocaine. The error in the admission of Detective Harpe's testimony was harmless in light of this evidence of Cole's guilt.[3]

## II. Jury Instruction

Cole also contends that the trial court erred in refusing his jury instruction on contamination. In reviewing a trial court's decision to give or refuse tendered jury instructions, we consider: (1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions that are given. *Chambers v. State*, 734 N.E.2d 578, 580 (Ind. 2000), *reh'g denied*. A defendant is only entitled to reversal if he affirmatively demonstrates that the instructional error prejudiced his substantial rights. *Hero v. State*, 765 N.E.2d 599, 602 (Ind. Ct. App. 2002), *trans. denied*.

Cole tendered the following jury instruction on contamination: "Contamination occurs when an unknown sample is mixed with or comes into contact with another, and that action causes an erroneous test." Tr. p. 163. The State objected to the instruction

---

[3] Though not addressed by the parties, we question the relevancy of the course-of-investigation evidence offered by the State. Detectives Harpe, McElfresh, and Officer Kraeszig testified at length about the DMI project. There was also testimony about the tip that spurred the officers' investigation of Cole. Course-of-investigation evidence is often offered to explain why law enforcement officers proceeded in a particular manner. "This 'background' information, however, generally is irrelevant and should be excluded." 1 Wharton's Criminal Evidence § 4:47 (15th ed. 1997). It is irrelevant if it does not make it more or less probable that the defendant committed the acts alleged. "In other words, the explanation for why the police did what they did may add nothing to the determination of the defendant's guilt or innocence." *Id.* While jurors may be curious about why investigators acted, an explanation of their actions may have no probative value. *Id.* (citation omitted). In addition, such evidence may also contain inadmissible hearsay and pose a threat of prejudice. *See Hernandez v. State*, 785 N.E.2d 294, 300 (Ind. Ct. App. 2003), *trans. denied*.

because no case law or citation accompanied it and because it suggested a "presumption that [contamination] causes an erroneous test . . . ." *Id.* The court agreed with the State and declined to give the instruction, saying, "I don't know where it comes from, and it does tend to lead the jury in a direction . . . ." *Id.* On appeal, the State argues that the trial court properly refused the instruction because there was no evidence in the record to support it. We agree.

Detective Harpe testified that he might have put the cocaine he purchased from Cole in his jacket pocket, but he could not remember. *Id.* at 52. He testified that if he had put the cocaine in his jacket pocket, it was possible that he might have worn that jacket in former undercover drug buys, making it further possible that the jacket pocket might have held drugs at some point. *Id.* However, Detective Harpe testified that it was "highly unlikely" that the cocaine had come into contact with any other substance, and critically, a forensic chemist, Dustin Crawford, said that the two tests he performed showed the substance to be cocaine. Crawford said that the gas chromatography test he had performed would have indicated any contaminants, which it did not do. *Id.* at 52, 108. He also testified that the chemical test would provide atypical results if the substance was contaminated, which it also did not do. *Id.* at 113-14. Because the evidence did not support giving the instruction on contamination, the trial court did not abuse its discretion in refusing it.

Even if we were to analyze the substance of the instruction, as Cole would have us do, we would reach the same conclusion. "The purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to

comprehend the case clearly and arrive at a just, fair, and correct verdict." *Gravens v. State*, 836 N.E.2d 490, 493 (Ind. Ct. App. 2005) (citing *Overstreet v. State*, 783 N.E.2d 1140, 1163 (Ind. 2003)). As the trial court noted, the instruction tendered by Cole had no citation and was vague and potentially misleading. The instruction referred to contact "with another," Tr. p. 163, yet "another" was not defined. The instruction also concludes that the automatic result of contact between a sample and "another" is an erroneous test, a conclusion that threatens to invade the province of the jury. The trial court did not err in refusing Cole's instruction on contamination.

Affirmed.

MATHIAS, J., and BARNES, J., concur.