## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**
Aug 24 2015, 9:06 am
*Kevin S. Smith*
**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Alice B. Blevins
Bartanen Law Office, LLC
Salem, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Hans Gunther Oberth, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | August 24, 2015 <br><br> Court of Appeals Case No. <br> 59A01-1409-CR-422 <br><br> Appeal from the <br> Orange Superior Court <br><br> The Honorable Larry R. Blanton, <br> Special Judge <br><br> Trial Court Cause No. <br> 59D01-1311-CM-820 |

**Kirsch, Judge.**

Following a bench trial, Hans Gunther Oberth was convicted of Class A misdemeanor criminal trespass.[1] He appeals and raises four issues that we restate and consolidate as the following:

> I. Whether the State presented sufficient evidence of trespassing to sustain his conviction;
>
> II. Whether the trial court abused its discretion by ordering Oberth to pay $500 to the county's pauper counsel fund; and
>
> III. Whether Oberth's one-year suspended sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

## Facts and Procedural History

Oberth served as the president of the Paoli Senior Citizens Center ("the Senior Center") for the 2012 term. The Senior Center is a 501(c)(3) organization, and it is located on property that is owned by the Town of Paoli. The general purpose is to foster fellowship, outings, and provide a location for activities. The membership dues are five dollars annually. In January 2013, the Senior Center elected Jerry Bird ("Bird") as the organization's new president. During Bird's term, Rebecca Walton was the chairman of the board of directors, and Anita Piper ("Piper") was the vice president.

---

[1] *See* Ind. Code § 35-43-2-2(a). We note that, effective July 1, 2014, a new version of this statute became effective, but we will apply the statute in effect at the time that Oberth committed his offense in November 2013.

[4] On July 8, 2013, the Senior Center's board of directors ("the Board") held a regular business meeting, and Oberth, a member of the Senior Center, attended in the audience. According to the facts most favorable to the judgment, Oberth's conduct was "very disruptive to the meeting." *Tr.* at 34. He repeatedly voiced concerns about the newsletter, would not stop talking when asked, posed objections "to anything that was said," and "he would interrupt and . . . voice his opinion and not quit." *Id.* at 7, 34, 43-44. Eventually, Bird asked Oberth to leave the meeting, but Oberth replied that he "wasn't leaving" and continued to talk, so Bird left the meeting and called the Paoli Police Department. *Id.* at 8.

[5] Assistant Chief of the Paoli Police Department Scott Dillman responded, along with Chief Sanders. While sorting out the situation, and in order to confirm the Board's intentions, Officer Dillman asked the Board members if they, in fact, desired to Oberth to leave, and the majority responded in the affirmative and further expressed that Oberth was not welcome at the Senior Center in the future. Officer Dillman advised the Board that they should seek a "No Trespassing Order." *Id.* at 57-58. Thereafter, Officer Dillman escorted Oberth off the property and told Oberth that the Board did not want Oberth to return to the Senior Center and that it intended to obtain a "No Trespassing Order." *Id.* at 58.

[6] Bird reviewed restraining order paperwork, but found that it appeared to concern "abuse" and was not appropriate to the situation. *Id.* at 24. Instead, Bird wrote a letter to the Paoli Police Department, providing some history to

the situation, in that "And now that [Oberth] is no longer president, he still wants to be in charge and try to monopolize the meetings," which "creates havoc[.]" *State's Ex*. 1. Bird thanked the police department for responding on July 8 and for the department's assistance with the situation. *Id*. The letter confirmed that "everyone agreed that [Oberth] was no longer welcome at the Paoli Senior Center." *Id*.

[7] Oberth returned to the Senior Center on July 13, 2013, during a dance that was open to the public. Bird was not present at that time, but Board member Jerry McDonald saw Oberth arrive. He and vice president Piper met Oberth outside and asked him to leave, but Oberth entered the building. Piper telephoned Bird to get direction on how to handle the situation. The police were called, and upon the officer's request, Oberth left the premises. Thereafter, Bird sent a second letter to the police department on behalf of the Board, recounting that Oberth had come to the Center on July 13, refused to leave, and was escorted off the property. The letter reported that Oberth was "not a Member in Good Standing" and "his membership dues will be refunded to him" such that his membership will be terminated. *State's Ex*. 3.

[8] On or about July 22, 2013, the Board sent by certified mail a check, which was written on the Senior Center's bank account, to Oberth in the amount of five dollars to revoke Oberth's membership. The memo line of the check read: "Refund of Membership Dues." *State's Ex*. 4. Oberth received the check, but wrote "I Refuse this Nonsense," on the check and returned it to a Board

member at a court hearing on another matter.[2] At the August 12, 2013, Board meeting, the Board officially voted to revoke Oberth's membership.

[9]     On or around July 30, 2013, Oberth sent a letter to the police department. In it, he referred to the contents of the second letter that Bird sent to the department "behind [his] back." *State's Ex.* 9. He maintained that the assertions that he was not a member in good standing and that the majority of members desired him to stay away from the Senior Center were "outright lie[s]." *Id.* He explained that he felt the need to "consistently complain" because the current Board chairman and president were disregarding the organization's by-laws and duties. *Id.* He concluded that, considering that he had never received a formal restraining order from the Board, he assumed that any verbal police order to stay away "is also cancelled." *Id.*

[10]    On November 20, 2013, the Board held a special meeting to nominate officers. Oberth arrived to attend the meeting. Before the meeting was called to order, Board secretary Carol Napier talked to Oberth and suggested, "Gunther please don't come in," but Oberth replied, "I'm going to go [in] and if you don't like it call the Police." *Tr.* at 46. Oberth entered the meeting room, at which time Bird called the police. Officer Dillman arrived, and he called the Board members out of the meeting room. To glean a consensus of what the majority

---

[2] Oberth sued at least three Board members in small claims court for, among other things, "severe embarrassment." *Tr.* at 20, 108. Oberth returned the five dollar check to a Board member during one of those hearings. Oberth noted that, although judgment was entered for the defendants in those cases, "I didn't lose. I just didn't win. There's a difference." *Id.* at 93.

of the Board desired, Officer Dillman asked them to indicate by hand vote whether they wanted Oberth off the premises. Ten of the twelve indicated that it was their intention that Oberth be removed from the Senior Center and not allowed to return. Police asked Oberth to leave, and when he refused, they arrested him. Oberth told Officer Dillman on the way to the police station that he had expected that he would be arrested that night, and, therefore, he had only brought with him his identification, rather than his entire wallet.

[11] About a week later, the State charged Oberth with Class A misdemeanor criminal trespass, alleging that, on or about November 20, 2013, Oberth, "not having a contractual interest in the property, did knowingly or intentionally enter the real property of [the Senior Center], after having been denied entry by [the Senior Center] or their agent." *Appellant's App.* at 12. The trial court conducted a bench trial in August 2014. The State called a number of witnesses, including Bird, McDonald, Napier, and Officer Dillman. Oberth moved for a directed verdict, which was denied.

[12] Thereafter, Oberth testified. He expressed that he takes "a great interest in the Center and care a lot about the Center and take an interest therefore in how it's run." *Tr.* at 75. He believed that Bird and the Board were not running the organization properly and failed to follow by-laws and other procedures. He maintained that, since he was a dues-paying member, and because he never received a No Trespassing Order, he had a right to be on the premises for meetings and other Senior Center activities. Upon cross examination, he acknowledged that, on July 8, 2013 he was told that he was no longer welcome

at the Senior Center, but he testified that he "assumed their verbal order for me not to return was . . . temporary" because he did not receive any formal no trespassing order. *Id.* at 78. He conceded that he had a copy of, or at least knowledge of, the second letter that Bird thereafter had written to the police department indicating that he was no longer welcome at the Senior Center. However, he stated, "[Bird] telling me that I'm not welcome is meaningless to me." *Id.* at 95. He acknowledged that on July 13 he went to the Senior Center, was escorted off the premises by police, and again was told that he was not welcome at the Senior Center. He further acknowledged that he received the check dated July 22, 2013 and recognized that it was intended to refund his membership dues to him, but explained that, although the Board had the intent to exclude him, "They had no authority. I didn't care what they said." *Id.* at 94-95. Oberth went to the November 20, 2013 special meeting because he intended to run for the office of president again.

[13] At the conclusion of the evidence, the trial court found Oberth guilty as charged. At the sentencing hearing, the trial court imposed a sentence of one year, all suspended, and ordered non-reporting probation. The trial court also ordered Oberth to pay a $500 fine to Orange County's pauper counsel fund. Oberth now appeals.

# Discussion and Decision

## I. Sufficiency of the Evidence

[14] When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Lyles v. State*, 970 N.E.2d 140, 142 (Ind. 2012); *Taylor v. State*, 836 N.E.2d 1024, 1026 (Ind. Ct. App. 2005), *trans. denied*. Rather, we look to the evidence and the reasonable inferences therefrom that support the conviction. *Taylor*, 836 N.E.2d at 1026. We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id*. "The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict." *Berry v. State*, 4 N.E.3d 204, 206 (Ind. Ct. App. 2014), *trans. denied*.

[15] The State charged Oberth with having committed Class A misdemeanor criminal trespass under Indiana Code section 35-43-2-2(a)(1), alleging that Oberth, not having a contractual interest in the real property of the Senior Center, knowingly or intentionally entered the Senior Center after having been denied entry by the Senior Center or its agent.[3] *Appellant's App*. at 12. A "contractual interest," as that phrase is used in the criminal trespass statute, refers to the right to be present on another's property, arising out of an agreement between at least two parties that creates an obligation to do or not to

---

[3] The statute was amended, effective July 1, 2014, such that the provisions of subsection (a)(1) now appear in subsection (b)(1) of Indiana Code 35-43-2-2.

do a particular thing. *Taylor,* 836 N.E.2d at 1026. A person "has been denied entry" under subdivision (a)(1) of this section when the person has been denied entry by means of:

(1) personal communication, oral or written;

(2) posting or exhibiting a notice at the main entrance in a manner that is either prescribed by law or likely to come to the attention of the public; or

(3) a hearing authority or court order [.]

Ind. Code § 35-43-2-2(b).[4] Oberth argues that the State did not present sufficient evidence that he lacked a contractual interest in the Senior Center. More specifically, Oberth maintains that he was (still) a dues-paying member and, therefore, had a contractual interest in the Senior Center and possessed an accompanying right to be on the premises.

[16] Although the trial court expressed that Oberth did not have a contractual right because the Senior Center was a voluntary organization, membership in it was a privilege, and its Board possessed authority to administer discipline without court intervention or involvement, the trial court specifically declined to rule on Oberth's membership status, finding that his membership status was not determinative of his guilt of the crime charged. *Tr.* at 117-18. The trial court instead focused on the fact that Oberth was told on several occasions, by the

---

[4] The cited provisions of subsection (b) now appear in subsection (c) of the statute.

Board and the police, that he was not to return to the Senior Center, he fully knew that the Board or a majority of it had agreed that he was no longer welcome, and he received – although refused to keep – the check refunding his membership dues. Yet, Oberth returned to the Senior Center on November 20, in fact expecting to be arrested. The trial court observed, "You had other remedies, . . . you could [have] put it in writing. . . . You could [have] sent a letter in writing to the President or the Chairman . . . ask[ing] for a hearing of why you should be excluded, why you should be barred from coming on the property." *Id*. at 119. Given the facts and circumstances before it, the trial court determined that that the State established a *prima facie* case of criminal trespass.

[17] Assuming without deciding that Oberth at one time had a contractual interest in the real property of the Senior Center, this court has recognized that having a contractual interest in being on property does not entitle the person to be disruptive without consequence. In *A.E.B. v. State*, 756 N.E.2d 536, 540 (Ind. Ct. App. 2001)*,* an assistant principal of a middle school informed A.E.B., a suspended student, to stay out of school until she heard from the school district's administrative office regarding her expulsion. *Id*. at 538. Despite the assistant principal's instruction, A.E.B. returned to school and was suspended once again. *Id.* After the second suspension, A.E.B. returned to school and went to several classrooms and verbally insulted the teachers. *Id.* at 539. A police officer told the defendant to leave the school or she would be arrested for trespassing and disorderly conduct, and the defendant refused to leave. *Id.* The

trial court found defendant to be a delinquent child for committing criminal trespass and disorderly conduct. *Id*. at 538-39. On appeal, she alleged that, because she was a student at the school, there was insufficient evidence that she did not have a contractual interest in the property. *Id.* at 540. We held, "[e]ven assuming that A.E.B.'s claim is correct, we find that A.E.B. violated whatever contract existed when she interfered with the educational activities at [the school]." *Id*. at 541. The court recognized, "The administration of [the middle school] had the power to request that A.E.B. leave the school property after she began to interfere with the educational activities to such an extent as to be guilty of the crime of disorderly conduct." *Id*.

[18]     We find such reasoning applies here, where several witnesses testified that Oberth was "very disruptive" at the July 8 meeting, as he continued to talk, would not sit down, made objections to "anything that was said," and interrupted Board members. *Tr.* at 34, 43. The Board asked Oberth to stop, but he would not do so, and thereafter, the police were called. Although Oberth was told on July 8 that he was not welcome anymore at the Center, he returned July 13, and he again was escorted off the premises. Oberth admitted that he was aware of Bird's subsequent letter to police, expressing that the Board considered him to be not in good standing as a member and that they would be refunding his dues. He received, but rejected, the five dollar check, refunding his membership dues. Thereafter, Oberth came to the November 20, 2013 special meeting of the Board, anticipating that he would be arrested. Based on the record before us, we find that Oberth extinguished whatever contractual

interest may have existed by knowingly or intentionally coming upon the premises, on repeated occasions, after he had been told, and thus possessed knowledge, that the Board considered his membership as revoked. *See Lyles,* 970 N.E.2d at 143 (State met its burden to disprove contractual interest of bank account holder by presenting evidence showing account holder was "irate and disrespectful" and bank manager had authority to ask customers to leave the bank premises). Considering the evidence and the reasonable inferences therefrom that support the conviction, we find that there exists evidence of probative value from which a reasonable trier of fact could have found Oberth guilty of criminal trespass.

## II. Pauper Counsel Fund

[19] Oberth contends the trial court erred when it ordered him to pay $500 to the pauper counsel fund. Sentencing decisions, including decisions to impose fines, costs, or fees are left to the trial court's discretion. *Wright v. State*, 949 N.E.2d 411, 413 (Ind. Ct. App. 2011). If the trial court imposes fees within statutory limits, there is not an abuse of discretion. *Id*.

[20] Indiana Code section 35-38-1-18 provides in pertinent part:

> [W]henever the court imposes a fine, it shall conduct a hearing to determine whether the convicted person is indigent. If the person is not indigent, the court shall order:
>
> (1) that the person pay the entire amount at the time sentence is pronounced;

(2) that the person pay the entire amount at some later date;

(3) that the person pay specified parts at designated intervals[.]

*See also* Ind. Code § 33-37-2-3 (providing same with regard to when trial court imposes costs). Oberth argues that "a hearing was not held as to his pauper status," as required by statute, and, therefore, the trial court committed sentencing error when it ordered him to pay the $500 fine to the county's local pauper counsel fund.[5] *Appellant's Br*. at 13. Based on the facts and circumstances of this case, we disagree.

[21] This court has recognized that "[i]t is not possible to set specific monetary guidelines for the determination of indigency." *Hall v. State*, 826 N.E.2d 99, 104 (Ind. Ct. App. 2005). However, here, at the sentencing hearing, before Oberth gave a statement in allocution prior to sentencing, the trial court asked Oberth about his age, any sources of income, whether he owned any real property, and that property's worth. As far as property ownership, Oberth responded that he owned only "a run down shambles," and he further stated that he had no source of income. *Tr*. at 133-34. After Oberth spoke, the trial court inquired, "You have five hundred dollars in bond money, correct?" and

---

[5] We note that the State initially asserts that Oberth did not object or raise any argument that the trial court did not conduct an adequate indigency hearing, and therefore, his claim is waived. However, this court has recognized, "The indigency issue cannot be waived." *Everroad v. State*, 730 N.E.2d 222, 225 n.5 (Ind. Ct. App. 2000) (citing *Meeker v. State*, 182 Ind. App. 292, 302, 395 N.E.2d 301, 307 n.6 (Ind. Ct. App. 1979)).

Oberth responded, "Yes."[6]  *Id*. at 136.  Thereafter, the trial court imposed a $500 fine, stating,

> [Y]ou'll be assessed five hundred ($500.00) dollars for . . . the representation that was provided you by the citizens of Orange County.

[22]   *Id*.  The trial court also ordered Oberth to pay a $50 initial probation fee, any other probation fees as set out by the probation department,[7] and costs in the amount of $168.  *Id*.  Before the hearing concluded, the trial court reiterated that Oberth, as part of his probation terms, would need to "pay Orange County five hundred ($500.00) dollars toward the . . . pauper counsel fund," but it expressly allowed, "[Y]ou can stretch that out over your year of probation."  *Id*. at 137.

[23]   The purpose behind an indigency hearing is to assure that a defendant is not imprisoned for inability to pay fees and costs.  *Wooden v. State*, 757 N.E.2d 212, 217 (Ind. Ct. App. 2001), *trans. denied*.  In this case, the trial court at the sentencing hearing questioned Oberth regarding his financial situation, and thus, Oberth had the opportunity to demonstrate to the trial court his ability (or inability) to pay a fine.  The trial court also appointed both trial and appellate pauper counsel to represent Oberth.  Given this record, where the trial court

---

[6] According to the Chronological Case Summary ("CCS"), Oberth posted a $1,000 cash bond in November 2013.  *Appellant's App*. at 5.

[7] We note that the CCS indicates, by entry of October 27, 2014, that Oberth was required to pay "$210 PUF fees," which presumably refers to probationary user fees.  *Appellant's App*. at 10.

was aware of Oberth's financial status, we find that the purpose behind an indigency hearing was met and that the trial court did not abuse its discretion by not holding a separate or additional indigency hearing.[8] *See Clenna v. State*, 782 N.E.2d 1029, 1034 (Ind. Ct. App. 2003) (no abuse of discretion in imposition of fees and costs, even though trial court did not hold separate "full-blown hearing" on subject of indigency, where defendant testified at sentencing to his minimal income, rent, and children to support); *Wooden*, 757 N.E.2d at 217-18 (although full-blown hearing at which evidence of defendant's assets and debts was not held, purpose of indigency hearing requirement was met, where trial court's statements and actions, including appointment of trial and later appellate pauper counsel, indicated court's awareness of defendant's continued indigency).

[24] Oberth urges that "the [trial court] applied his bond to the payment of the fine, leaving him with no monies to apply towards his probation fees and costs." *Appellant's Br*. at 13. Contrary to the assertion that the trial court "applied the bond" to the fine, the record indicates that the trial court specifically told Oberth that he could make payments on the $500 fine over the course of a year. Further, to the extent that Oberth is arguing that the trial court should not have imposed the fine because he was indigent, our Supreme Court has held that a

---

[8] We do not have in the record before us Oberth's bail bond agreement, but this court has recognized that a trial court may order disbursement of bond money to reimburse the local drug task force, and an indigency hearing is not required, where the terms of the bail bond agreement provided that fines, fees, and costs of representation could be retained from the bond money held in escrow. *Wright v. State*, 949 N.E.2d 411, 416 (Ind. Ct. App. 2011).

trial court may impose a fine or costs on an indigent defendant. *Wheldon v. State*, 765 N.E.2d 1276, 1279 (Ind. 2002); *see also Kimbrough v. State*, 911 N.E.2d 621, 638 (Ind. Ct. App. 2009) (trial court may impose fine or costs on indigent defendant, but indigent person cannot be imprisoned for failing to pay fines or costs). The trial court here specifically confirmed that $500 in bond money was still available, and, further, it allowed Oberth to make payments toward the fine over the course of a year. We find no abuse of discretion in the trial court's imposition of the fine.[9]

## III. Sentencing

[25] At the sentencing hearing, the State argued for the imposition of a sentence consisting of one year in the Orange County Jail and a $5,000 fine, while Oberth's counsel requested that the trial court impose a fully-suspended sentence with some period of probation. Oberth contends that the one-year suspended sentence with non-reporting probation imposed by the trial court is inappropriate. Article 7, Sections 4 and 6 of the Indiana Constitution authorize independent appellate review and revision of a sentence imposed by the trial court. *Marley v. State*, 17 N.E.3d 335, 338 (Ind. Ct. App. 2014), *trans. denied*. This appellate authority is implemented through Indiana Appellate Rule 7(B), which provides that the court on appeal "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds

---

[9] We note that the $1000 cash bond was released on September 12, 2014, by court order, following the September 3 sentencing hearing. *Appellant's App*. at 5, 10.

that the sentence is inappropriate in light of the nature of the offense and the character of the offender." We recognized the unique perspective that a trial court brings to sentencing decisions. *Marley*, 17 N.E.3d at 338. Thus, the trial court's judgment "should receive considerable deference." *Cardwell v. State,* 895 N.E.2d 1219, 1222 (Ind. 2008). Our inquiry is not whether another sentence is more appropriate; rather, it is whether the sentence imposed is inappropriate. *Marley*, 17 N.E.3d at 339 (citing *Fonner v. State*, 876 N.E.2d 340, 344 (Ind. Ct. App. 2007)). The defendant bears the burden of persuading us that the sentence imposed was inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[26] With respect to the nature of the offense, Oberth asserts that he merely attended meetings and events at the Senior Center, which he believed that he, as a member, had a legal right to do. The State maintains, however, that Oberth engaged in "continued criminal activity" over the course of several months, by appearing and disrupting meetings and by returning more than once to the Senior Center after being asked by both the Board and police to leave and not return. *Appellee's Br*. at 15. While Oberth claims that "[n]o evidence was offered that [Oberth] acted out of . . . ill will," we find that the record indicates otherwise. *Appellant's Br*. at 10. Bird's letter to the police department asserted that even though Oberth "is no longer President, he still wants to be in charge and try to monopolize the meetings. This just creates havoc and causes a lot of hard feelings among the members." *State's Ex*. 1. Oberth has not persuaded us

that the nature of his offense necessitates a reduction in his one-year suspended sentence.

[27] With regard to his character, Oberth reminds us that he has no criminal history. He also maintains that, at all times relevant to the case, he was "acting based upon his ideals and belief in the structure and rules of our society" and intended only to express his concerns that the Board was disregarding the organization's by-laws. *Appellant's Br.* at 10-11. As the trial court observed, while Oberth "ha[d] a right to raise [his] objections," he did not have a right to be an "obstructionist" and/or disrupt Board meetings, which affected other members' use and enjoyment of the Senior Center. Oberth has not demonstrated that the sentence imposed was inappropriate in light of his character. Under Indiana Appellate Rule 7(B), Oberth was required to prove that his sentence was inappropriate in light of both the nature of the offense and the character of the offender. He has not met that burden.

[28] Affirmed.

Najam, J., and Barnes, J., concur.