## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 22 2019, 7:35 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Thomas Lowe
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Laura R. Anderson
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Michael Andrew Ray,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff*

August 22, 2019

Court of Appeals Case No.
18A-CR-2354

Appeal from the Orange Circuit
Court

The Honorable Steven L. Owen,
Judge

Trial Court Cause No.
59C01-1303-FA-168

**Altice, Judge.**

**Case Summary**

[1] Following a jury trial, Michael Andrew Ray was convicted of Class A felony attempted dealing in methamphetamine, Class D felony possession of methamphetamine, and two counts of resisting law enforcement, one as a Class D felony and one as a Class A misdemeanor. Ray was also found to be a habitual offender. The trial court sentenced Ray to an aggregate term of eighty-six years executed. Ray presents four issues for our review:

> 1. Do his convictions for Class D felony and Class A misdemeanor resisting law enforcement violate double jeopardy principles?
>
> 2. Did the trial court abuse its discretion in denying Ray's challenge for cause during voir dire and his request to dismiss a juror after the trial began?
>
> 3. Did the trial court abuse its discretion in admitting evidence relating to other crimes, wrongs, or acts?
>
> 4. Is Ray's conviction for attempted dealing methamphetamine supported by sufficient evidence?

[2] We affirm in part, reverse in part, and remand with instructions.

### Facts & Procedural History

[3] On March 7, 2013, Jason Lomax, a United States Postal Service employee, found a FedEx package in his mailbox that had been opened and "hastily . . .

put back together with some clear tape."[1] *Transcript Vol. 3* at 96. As a postal service employee, Lomax knew that FedEx would not have put the package in his mailbox because it required a signature and is against the law for FedEx to put packages in a U.S. mailbox. When Lomax discovered this package in his mailbox, he also observed a vehicle parked approximately 100 feet away off the side of the road. He did not recognize anyone in the vehicle, but believed they were "staking out [his] mailbox." *Id*.

[4] Lomax then went to his mother's house, which was on the same property and shared the same mailing address. Lomax learned that a man resembling Ray, who is Lomax's nephew, was seen speaking with the FedEx driver. Lomax called FedEx directly and was informed that a "Dwayne Johnson" had signed for the package. *Id*. at 99. Other than the actor, Dwayne "The Rock" Johnson, Lomax did not know anyone else by that name. Lomax then left to head into town and noticed the same vehicle still parked on the street just down from his mailbox. Lomax called the police to report the issue with his mail and identified Ray as possibly being involved.

[5] Sheriff Josh Babcock took the report from Lomax. Sheriff Babcock then checked with dispatch and learned that there was an outstanding warrant for Ray. Sheriff Babcock contacted Detective Shane Staggs of the Indiana State Police (ISP) and asked for his assistance in locating Ray. Sheriff Babcock, who

---

[1] Lomax was expecting this package as it contained new bank cards.

was in uniform, and Detective Staggs, who was familiar with Ray, drove in Babcock's marked patrol car toward Lomax's residence. As they approached, they observed a vehicle parked on the side of the road near Lomax's mailbox. Sheriff Babcock drove his patrol car right up to the front of the vehicle with the lights activated. Detective Staggs recognized Ray as the individual in the driver's seat and noted that there was also a female passenger in the front seat.

[6] Both officers exited the vehicle, and within a few seconds Ray put his vehicle into reverse and "backed out at a pretty high rate of speed." *Id*. at 65. The officers got back in their vehicle and gave chase with lights and sirens activated. They pursued Ray for twenty-three miles, reaching speeds up to seventy-four miles per hour. During the pursuit, a black object and a silver, metal object were thrown out of the car through the passenger window. As Sheriff Babcock continued with the pursuit, Detective Staggs called out through dispatch the locations of where the items were thrown. Other officers went to those locations and recovered a gun and a black bag that contained two digital scales, a razor blade, and small plastic baggies, among other items.

[7] The chase came to an end when Ray suddenly swerved his vehicle off the roadway, through a barbed-wire fence, and approximately 150 yards into a muddy cornfield before coming to a stop. Ray exited the vehicle and took off on foot. Sheriff Babcock stopped his vehicle on the roadway, and Detective Staggs began pursuing Ray, yelling at him to stop. As Ray was running, he threw away a Marlboro cigarette package, which Detective Staggs later recovered. Inside the cigarette package was a small baggie of

methamphetamine weighing .79 grams. Detective Staggs caught up with Ray after Ray fell. Detective Staggs held Ray at gunpoint until Sheriff Babcock arrived and handcuffed him.

[8] Ray was then transported to the police station. During the drive, Ray admitted that he had been "shooting up methamphetamine" and that he was "not proud of it." *Id*. at 233. As Ray was being booked into jail, officers recovered a baggie containing 1.32 grams of methamphetamine and a cell phone from Ray's person.

[9] When interviewed, Ray was asked about the mail he was waiting to be delivered to Lomax's mailbox, and Ray claimed he was waiting for a letter from his mother from prison. Sheriff Babcock told Ray that they knew that Ray was waiting for a package to be delivered and that Lomax had already received the package and sent it back to the post office. Ray dropped his head in "[k]ind of a defeated action." *Id*. at 73.

[10] At Sheriff Babcock's request, ISP Officer Paul Andry went to the post office to investigate the package that had been delivered to Lomax's address but which Lomax had returned. The postal service employees had already set the package aside and contacted United States postal inspectors because they too had suspicions. The package was addressed to Lomax's address, but to a "Dawn Spelling" and was from a "Gary Patton" in Las Vegas. *Id*. at 146. ISP officer Robbie Lambert and his drug canine were called to the post office to do a drug sniff. The subject package was placed among other packages. The drug canine

performed an open-air drug sniff and alerted to the subject package. Officer Andry took possession of the package and obtained a search warrant. He then opened the package and found methamphetamine, later determined to have a total weight of 41.74 grams. Officer Andry testified that the amount was significant and indicated that it was not for personal use, but rather for dealing. The methamphetamine was "a very pure form of crystal methamphetamine" that had a street value of around $5000 before being cut with another substance to increase the volume and thereby increase profits. *Id*. at 151.

[11] A search warrant was also obtained to search the phone found on Ray's person. The phone was a flip-phone, so pictures were taken of text messages that were found on the phone. These photographs were admitted into evidence over Ray's objection.[2] Ray's phone was lost at some point thereafter and thus, was not admitted into evidence during the trial.

[12] On March 11, 2013, the State charged Ray with Class A felony attempted dealing in methamphetamine, Class C felony possession of methamphetamine (enhanced by possession of a firearm), Class B felony unlawful possession of a firearm by a serious violent felon, Class D felony resisting law enforcement (fleeing by car), and Class A misdemeanor resisting law enforcement (fleeing on

---

[2] In order to document the full text of some of the messages, it was necessary to take several photographs, with some overlap of the text message from one exhibit to the next. In total, there were 105 photographs related to the phone and text messages that were admitted at trial. *See Exhibits* 29-133.

foot). The State also alleged that Ray was a habitual offender as well as a habitual substance offender.

[13] On August 6, 2018, Ray filed a motion to suppress,[3] a motion to dismiss the attempted dealing charge,[4] and a motion in limine relating to Ind. Rules of Evidence 404(B)[5] and 704(B). The trial court denied the motion to suppress and motion to dismiss, but granted Ray's motion in limine, although noting that its ruling regarding Evid. R. 404(B) was subject to change at trial. A three-day jury trial commenced on August 7, 2018.

[14] During voir dire, Ray exhausted his peremptory strikes. He then sought to challenge Juror 990 for cause given certain statements the juror made that Ray claimed reflected the juror could not be fair and impartial in considering the evidence. The trial court denied Ray's challenge for cause. After the first witness finished testifying, Juror 989 informed the court that she knew of two individuals referenced during the first witness's testimony. The trial court questioned Juror 989 and concluded that she remained impartial and did not

---

[3] Ray sought to suppress the methamphetamine found in the package at the post office and photographs of text messages found on his phone. With regard to the latter, Ray cited a lack of chain of custody and his inability to examine the phone from which the text messages were photographed.

[4] Ray argued that the anticipated evidence was lacking with respect to establishing that he engaged in a substantial step toward commission of a crime. Specifically, he argued that the anticipated evidence would establish only that he engaged in acts that constituted "mere preparation." *Appellant's Appendix Vol. II* at 248.

[5] In his motion in limine regarding Evid. R. 404(b), Ray sought to prevent the introduction of evidence "related to a letter which was submitted by [Ray] following a guilty plea." *Appellant's Appendix Vol. II* at 240.

know the facts of the case outside of what had been presented at trial. The court denied Ray's request that the Juror 989 be dismissed.

[15] At trial, the State admitted pictures of the text messages found on Ray's phone. The exhibits were admitted in sets, Exhibits 29-38, 39-51, 52-63, 64-74, 75-88, 89-100, 101-12, 113-26, and 127-133. When the State offered the first set of exhibits (Exhibits 29-38), Ray objected claiming they amounted to "inadmissible hearsay" and that there was a lack of evidence pertaining to chain of custody. *Transcript Vol. 3* at 174. The trial court overruled Ray's objections and admitted Exhibits 29-38 into evidence. This first set of exhibits contained text messages pertaining to a tracking number, that Ray had been waiting for the package to be delivered for several hours, and questions about what day the package would be delivered.

[16] Prior to admission of the second set of exhibits (Exhibits 39-51), Ray objected on the "same grounds as before." *Id.* at 181. The trial court overruled Ray's objection. This set of exhibits contained text messages discussing money and a potential drug transaction. In one message, someone inquired, "hey can you run half by". *Id.* at 182; *Exhibit* 41. Sheriff Babcock testified that the reference to "half" could be referring to the sale of narcotics. *Transcript Vol. 3* at 182. Within this set of text messages, there were also references to an exchange of money and "perks," which Sheriff Babcock believed to be a reference to Percocet, a narcotic prescription medication. *Id.* at 183.

[17] With regard to the third set of exhibits (Exhibits 52-63), Ray objected on the same grounds and added that "it touches on issues of 404 I believe." *Id*. at 184. The trial court again overruled Ray's objection. Within this set of exhibits, an individual had sent a message to Ray's phone that he or she "need a little bit go go i got some cash." *Id*. at 185; *Exhibits* 62. Sheriff Babcock testified that "go go" is a street name for methamphetamine. *Transcript Vol. 3* at 185.

[18] Prior to the admission of the remaining sets of exhibits (Exhibits 64-133), Ray posed the "same objection." *Id*. at 187, 188, 192, 193, 195; *see also Id*. at 190 ("object for the same reasons"). The trial court overruled each objection and admitted the evidence. The text messages in these exhibits generally pertained to drug transactions involving methamphetamine, Xanax, and narcotic prescription painkillers. In discussing final instructions for the jury, the trial court granted Ray's request for a 404(B) limiting instruction relating to the text message evidence that referred to drug transactions aside from those involving methamphetamine.

[19] At the conclusion of the evidence, the jury found Ray guilty of Class A felony attempted dealing in methamphetamine, Class D felony possession of methamphetamine as a lesser-included offense of the Class C felony charge, and both counts of resisting law enforcement. The jury found that Ray was not in possession of a firearm. Following the second phase of the trial, the jury found Ray to be a habitual offender. On August 28, 2018, the trial court sentenced Ray to fifty years on the Class A felony attempted dealing conviction and enhanced the sentence by thirty years for the habitual offender

determination. The court also imposed consecutive three-year sentences on each Class D felony conviction, and a concurrent one-year sentence for the misdemeanor resisting conviction, for a total sentence of eighty-six years imprisonment. Ray now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

### 1. Double Jeopardy

[20] Ray argues that his two convictions for resisting law enforcement violate double jeopardy principles. The State properly acknowledges that Ray's conviction for Class A misdemeanor resisting law enforcement violates double jeopardy principles, and therefore, must be vacated. *See Norris v. State*, 113 N.E.3d 1245, 1253 (Ind. Ct. App. 2018) (noting that a defendant cannot be convicted of both misdemeanor and felony resisting law enforcement when he flees in a vehicle, gets out, and immediately flees on foot), *trans. denied*; *Lewis v. State*, 43 N.E.3d 689, 691 (Ind. Ct. App. 2015) (same); *Arthur v. State*, 824 N.E.2d 383, 385 (Ind. Ct. App. 2005). Here, Ray fled in his car and then immediately fled on foot. Under such circumstances, there is but one continuous act of resisting law enforcement. Accordingly, there can be but a single conviction for such offense. *See Nevel v. State*, 818 N.E.2d 1, 8-9 (Ind. Ct. App. 2004). We therefore remand to the trial court with instructions to vacate Ray's conviction and sentence for Class A misdemeanor resisting law enforcement.

### 2. Juror Issues

## A. Juror 990

[21] Ray argues that the trial court's denial of his challenge for cause to Juror 990 violated his constitutional right to an impartial jury. The United States and Indiana Constitutions guarantee the right to an impartial jury. *Oswalt v. State*, 19 N.E.3d 241, 245 (Ind. 2014). The purpose of voir dire is to determine whether the potential jurors can render a fair and impartial verdict in accordance with the law and evidence. *Kimbrough v. State*, 911 N.E.2d 621, 628 (Ind. Ct. App. 2009). For-cause challenges are available to exclude any prospective juror whose "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id*. (quoting *Wainwright v. Witt*, 469 U.S. 412, 423-24 (1985)).

[22] The trial court has discretion to grant or deny challenges for cause, and we review the trial court's decisions in this regard for an abuse of that discretion. *Merritt v. Evansville-Vanderburgh Sch. Corp.*, 765 N.E.2d 1232, 1235 (Ind. 2002). "The trial court has the unique position to observe and 'assess the demeanor of prospective jurors as they answer the questions posed by counsel.'" *Oswalt*, 19 N.E.3d at 245 (quoting *Smith v. State*, 730 N.E.2d 705, 708 (Ind. 2000)). "[O]n appeal, we afford substantial deference to the trial judge's decision . . . and will find error only if the decision is illogical or arbitrary." *Id*. (quoting *Whiting v. State*, 969 N.E.2d 24, 29 (Ind. 2012)).

[23] During voir dire, Juror 990 stated that he was a businessman in the community, running a local office supply store, and that he was familiar with some of the

identified witnesses, of which at least one was a customer. He explained that "as a businessman I wouldn't be a very good businessman if I didn't take care of my customers when they buy stuff or whatever so . . . I'd be leaning towards people that I know." *Transcript Vol. 3* at 17. He also stated that if the trial went longer than indicated, he "would blame the counsel and . . . probably lean the other way . . . [b]ecause he would realize that [he] was losing customers." *Id*. at 20. Ray, who had used all of his peremptory strikes,[6] moved to strike Juror 990 for cause in light of these statements. The trial court denied Ray's challenge, finding that despite his comments, Juror 990 stated that he was not biased or prejudiced against either side and that he would try to put aside the fact that he was acquainted with some of the identified witnesses.

[24] Our review of Juror 990's voir dire convinces us that the trial court was within its discretion to deny Ray's for-cause challenge. While Juror 990 stated that he would have to side with a person with whom he had an established relationship, he admitted that he knew some of the identified witnesses only "a little bit" and that he did not have an on-going, established relationship with any of them that would have caused him to give more credence to their testimony over any other testimony. *Transcript Vol. 3* at 18, 19. As the trial court found, Juror 990 also stated that he was not biased or prejudiced for or against either side and that his associations with the identified witnesses was

---

[6] Having exhausted his peremptory challenges, Ray satisfied the exhaustion rule, which requires that a defendant have used all of his allotted peremptory challenges in order to preserve for appeal a claim that the trial judge erred in denying a challenge for cause. *See Whiting*, 969 N.E.2d at 29-30.

that he knew of them from being a businessman in the community. To the extent that Juror 990 said he would "blame the counsel" if the trial took longer than expected, the trial court found that such did not indicate a particular bias and could be avoided by making sure the trial was completed in a timely manner. *Id.* at 20. At no time did Juror 990 express or show any actual or implicit bias for or against Ray or the State. Rather, Juror 990 stated that he would try to put aside his knowledge of some of the witnesses, listen to the evidence, and be a fair and impartial juror. We therefore affirm the trial court's denial of Ray's for-cause challenge to Juror 990.

### B. Juror 989

[25]     Ray also argues that the trial court abused its discretion in denying his request to dismiss Juror 989 after the trial started. At the end of the first day of trial, just after Sheriff Babcock testified, Juror 989 notified the court that she knew two individuals who Sheriff Babcock mentioned during his testimony. The following morning, Juror 989 was questioned in chambers by the trial court judge, with all attorneys in attendance. Juror 989 explained that she did not personally know one of the individuals and that she sometimes saw the other individual at family get togethers but had not seen her in a while. Juror 989 also stated that Ray looked familiar, but that she did not know him. When questioned by the court, Juror 989 confirmed that she did not know any material facts about the case, that she had not heard anything about the case outside of the trial, and that she did not know anything about the alleged incident.

[26] After Juror 989 left the trial judge's chambers, Ray requested that Juror 989 be dismissed. Ray informed the court that "it's a little more complicated," noting various relationships between Ray, the individuals mentioned by Sheriff Babcock, and Juror 989. *Id*. at 89. The trial court did not call Juror 989 back into chambers to further inquire given Ray's claims of a "more complicated" scenario. *Id*. The court also noted that the individuals with whom Ray was familiar were not witnesses in the current action. The court therefore denied Ray's request to dismiss Juror 989.

[27] Although Ray frames his argument regarding Juror 989 as if it were a challenge for cause during jury selection, his argument is more properly addressed under Ind. Jury Rule 24, which addresses the procedure for when the trial court becomes aware of a juror with personal knowledge about the case. J.R. 24 provides:

> If the court receives information that a juror has personal knowledge about the case, the court shall examine the juror under oath in the presence of the parties and outside the presence of the other jurors concerning that knowledge.

> If the court finds that the juror has personal knowledge of a material fact, the juror shall be excused, and the court shall replace that juror with an alternate. If there is no alternate juror, then the court shall discharge the jury without prejudice, unless the parties agree to submit the cause to the remaining jurors.

[28] Here, the court followed this procedure and found that Juror 989 "professed that she had no knowledge of any material element of this case." *Transcript Vol.*

*3* at 91. While she was acquainted with the mentioned individuals, she indicated that she did not personally know one of them and that she had not seen the other individual in quite some time. She brought such to the attention of the court only because she did not "know where the trial [wa]s going." *Transcript Vol. 3* at 86.

[29] Having reviewed the record, we will not second guess the trial court's assessment that Juror 989 "didn't know any fact that would affect her ability to be fair and impartial, . . . and didn't know a material fact of the case." *Id.* at 89. The court was not obligated to inquire further after Ray claimed that the juror may have had a "deeper relationship" with individuals associated with or in some way connected to Ray, especially in light of the juror's responses to the court's direct questions regarding the same. *Appellant's Brief* at 21. The trial court did not abuse its discretion in denying Ray's request to dismiss Juror 989.

### 3. Admission of Evidence

[30] Ray argues that the trial court abused its discretion in admitting the text messages relating to other crimes, wrongs, or acts and testimony related thereto. Ray points out that the State introduced 105 photographs of text messages taken from the phone that was found on his person and claims that only about 11 of them can be construed as having anything to do with receiving a package. He notes that many of the texts are replete with references and allusions to drugs and drug transactions unrelated to methamphetamine. Ray also argues that the court abused its discretion by permitting Sheriff Babcock to read each

text message into evidence and offer his personal suppositions about what the text messages meant to him.

[31] We review evidentiary decisions for an abuse of discretion and will reverse only when the decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Nicholson v. State*, 963 N.E.2d 1096, 1099 (Ind. 2012). "A claim of error in the exclusion or admission of evidence will not prevail on appeal unless the error affects the substantial rights of the moving party." *McCarthy v. State*, 749 N.E.2d 528, 536 (Ind. 2001).

[32] We begin by noting that Ray did not object to Sheriff Babcock's reading of the text messages or his interpretation of what was being discussed in the text messages. We further note that Ray did not object to the first two sets of exhibits on Evid. R. 404(b) grounds. Ray has therefore waived his right to challenge Sheriff Babcock's testimony or the admission of Exhibits 29-38[7] and 39-51. *See Washington v. State*, 840 N.E.2d 873, 886 (Ind. Ct. App. 2006) (stating that failure to object at trial results in wavier of an issue for purposes of appeal).

[33] Ray first asserted his Evid. R. 404(b) objection prior to the admission of the third set of text message photographs (Exhibits 52-63) and then asserted the "same objection" to the remaining photographs of the text messages (Exhibits

---

[7] Ray concedes that Exhibits 29-38 were directly related to the case as the messages pertained to him waiting for the package at Lomax's address and a tracking number therefor.

64-133). Ind. Evidence Rule 404(b)(1) provides that evidence of other crimes or wrongful acts is not admissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." The well-established rationale behind this rule is that the jury is precluded from making the "forbidden inference" that the defendant had a criminal propensity and therefore engaged in the charged conduct. *Hardin v. State*, 611 N.E.2d 123, 129 (Ind. 1993). Such evidence, however, may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid. R. 404(b)(2).

[34] We first observe that Exhibits 61-63, 113-15, 125, and 127-33 referenced potential sales of methamphetamine, in that two of the text messages received by Ray requested "go go" and "a little bump," which, according to Sheriff Babcock, are both slang terms for methamphetamine. *Transcript Vol. 3* at 185, 193-94; *Exhibits* 61-63, 113-15. In text messages sent by Ray, he stated that he had "go fast," which Sheriff Babcock testified was another slang term for methamphetamine, and that he would soon have "some of that good real good stuff." *Transcript Vol. 3* at 194-96; *Exhibits* 125, 127-33. This evidence pertains to the charged crimes and thus, is not evidence of other crimes or acts.

[35] We are thus left with those exhibits that reference or allude to drug transactions unrelated to methamphetamine. Even if we assume the trial court abused its discretion in admitting these text message exhibits into evidence, we conclude that any such error was harmless. No error in the admission of evidence is

grounds for setting aside a conviction unless the erroneous admission appears inconsistent with substantial justice or affects the substantial rights of the parties. Ind. Trial Rule 61. The improper admission of evidence is harmless error when the conviction is supported by such substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction. *Wickizer v. State*, 626 N.E.2d 795, 800 (Ind. 1993). To decide if the erroneous admission of prejudicial evidence of extrinsic offenses is harmless, we therefore evaluate whether the jury's verdict was substantially swayed. *Id.*; *see also Meadows v. State*, 785 N.E.2d 1112, 1122 (Ind. Ct. App. 2003) (stating that the erroneous admission of evidence is harmless if there is substantial independent evidence of guilt such that there is no substantial likelihood that the improper evidence contributed to the verdict).

[36] Here, the State presented overwhelming evidence of Ray's guilt such that we are convinced that the text messages related to dealing prescription narcotics did not contribute to the verdict. The State connected Ray to the package containing the large quantity of methamphetamine through his text messages in which he asked about the tracking number and discussed timing of the package delivery. Ray also indicated that he had been at the address waiting for hours for delivery of the package. Ray was observed speaking with a FedEx delivery driver earlier the same day that Lomax discovered a previously opened and hastily taped-back-together package in his mailbox. Lomax and police also observed Ray staking out Lomax's mailbox. Ray later stated in response to

questioning that he was waiting on mail at that address, even though he did not live there or ever receive mail there. When told that the package had been returned to the post office, Ray showed a consciousness of guilt by dropping his head in defeat. In addition, the black bag that was thrown from Ray's vehicle as he fled from the police contained items that are utilized in dealing methamphetamine, including two digital scales, a razor blade, and plastic baggies.

[37] In short, the State presented evidence that clearly linked Ray to the package containing a significant amount of pure methamphetamine that was indicative of dealing. Ray also possessed items used to weigh, cut, and package the methamphetamine for sale. With such overwhelming evidence of Ray's guilt, we cannot say that the challenged text messages contributed to the jury's verdict.[8]

### 4. Sufficiency

[38] Ray argues that the evidence is insufficient to support his conviction for attempted dealing in methamphetamine. Our standard of review for sufficiency of the evidence claims is well settled. We consider only the probative evidence

---

[8] We also note that the trial court granted Ray's request for a limiting instruction. As part of the court's final instructions, the jury was instructed as follows:

> Evidence has been introduced that the Defendant was involved in crimes, wrongful conduct, and/or bad acts other than those charged in the information. This evidence has been received solely on the issue of Defendant's intent, preparation, plan, or knowledge. This evidence should be considered by you only for that limited purpose.

*Transcript Vol. 4* at 117; *Appellant's Appendix Vol. III* at 69.

and reasonable inferences supporting the conviction. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess the credibility of witnesses or reweigh evidence, and we will affirm unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id*. It is not necessary that the evidence overcome every reasonable hypothesis of innocence; rather, the evidence will be found sufficient if an inference may reasonably be drawn from it to support the conviction. *Id*. at 147.

[39] At the time of the instant offense, Ind. Code § 35-48-4-1.1(a)(2) provided that a person who possesses with intent to deliver methamphetamine commits dealing in methamphetamine, a Class B felony. If the amount of the methamphetamine weighed three grams or more, the offense was a Class A felony. Because Ray did not succeed in obtaining the package due to police intervention, the State sought to convict him of attempted dealing in methamphetamine. To do so, the State was required to prove that Ray, while acting with the culpability required for commission of the crime, engaged in conduct that constituted a substantial step toward possessing methamphetamine in excess of three grams with intent to deliver such methapmhetamine. *See* Ind. Code § 35-41-5-1(a).

[40] Ray specifically challenges the evidence regarding whether he took a substantial step. A substantial step is "any overt act beyond mere preparation and in furtherance of the intent to commit the offense." *Kiplinger v. State*, 922 N.E.2d 1261, 1266 (Ind. 2010). The evidence favorable to the verdict showed that on March 6 and 7, 2013, Ray was waiting for the arrival of a FedEx package to be

delivered to Lomax's address, a residence where he did not reside and where he did not receive mail. The package was addressed to Lomax's address and to a "Dawn Spelling," a person unknown to Lomax.

[41]     On March 6, Ray sent text messages to another individual asking for a tracking number and indicating that he had been at Lomax's address for several hours. The individual responded to the message stating that he sent the tracking number. Ray then texted the individual asking whether the package would be delivered that day, to which the individual responded that delivery could not be guaranteed for that day, so the package would arrive either that day or the next.

[42]     On March 7, 2013, Lomax arrived home and found a FedEx package that had been opened and taped back together in his mailbox. He also observed a vehicle "staking out" his mailbox. *Transcript Vol. 3* at 96. Lomax then learned that a man who looked like Ray was seen talking to the FedEx delivery driver. Lomax reported the issue with the package and his suspicions about Ray to the police.

[43]     The police investigated Lomax's complaint. As they approached Lomax's residence, they observed the car that was "staking out" Lomax's residence and identified Ray as the person sitting in the driver's seat. *Id*. When the police initiated contact, Ray put his car in reverse and sped off, leading the officers on a twenty-three mile chase during which a black bag was thrown out of the car. The black bag was recovered and found to contain items commonly used to package and deal methamphetamine.

[44] The FedEx package that Lomax returned to the post office was found to contain 41.74 grams of "very pure" crystal methamphetamine with a street value of $5000. Further, Lomax admitted that he was waiting on mail at Lomax's address, although he claimed that he was waiting on a letter from his mother from prison. When informed that the package had been returned to the post office, Ray dropped his head in a defeated manner.

[45] In short, Ray waited at Lomax's address for several hours across two days and texted another individual to get the tracking number and to try to pinpoint when the package would be delivered. Ray was seen talking to a FedEx delivery driver on the same day Lomax discovered a previously opened FedEx package in his mailbox. A reasonable inference can be drawn that Ray intercepted this FedEx package believing it was the package that contained the methamphetamine. Ray continued to stake out Lomax's residence, waiting to take possession of the methamphetamine contained therein upon delivery by FedEx, until police arrived. This evidence is sufficient to show that Ray took a substantial step toward possessing the package containing methamphetamine. We therefore affirm Ray's conviction for attempted dealing methamphetamine as a Class A felony.

[46] Judgment affirmed in part, reversed in part, and remanded with instructions.

Kirsch, J. and Vaidik C.J., concur.